## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF NEW JERSEY
   Richard J. Hughes Justice Complex
   25 Market Street, 8th Floor, West Wing
   Trenton, NJ 08625;

STATE OF ILLINOIS
   100 West Randolph Street, 12th Floor
   Chicago, IL 60601;

STATE OF MARYLAND
   200 Saint Paul Place, 20th Floor
   Baltimore, MD 21202;

COMMONWEALTH OF MASSACHUSETTS
   105 William Street
   New Bedford, MA 02740;

STATE OF MINNESOTA
   445 Minnesota Street, Suite 1400
   St. Paul, MN, 55101;

and

STATE OF NEW YORK
   28 Liberty Street, 15th Floor
   New York, NY, 10005,

                Plaintiffs,

        v.

R. ALEXANDER ACOSTA, *in his official capacity as Secretary of the United States Department of Labor*
   200 Constitution Avenue NW
   Washington, DC 20210;

No. _____

LOREN SWEATT, *in her official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health*
200 Constitution Avenue NW
Washington, DC 20210;

UNITED STATES DEPARTMENT OF LABOR
200 Constitution Avenue NW
Washington, DC 20210;

and

OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION
200 Constitution Avenue NW
Washington, DC 20210,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The State of New Jersey, the State of Illinois, the State of Maryland, the Commonwealth of Massachusetts, the State of Minnesota, and the State of New York (collectively "Plaintiff States") hereby file this Complaint seeking declaratory and injunctive relief against R. Alexander Acosta, in his official capacity as Secretary of Labor; Loren Sweatt, in her official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health; the U.S. Department of Labor; and the Occupational Safety and Health Administration ("OSHA") (collectively, "Defendants") and, in support thereof, state the following:

1.      This lawsuit challenges Defendants' illegal and unjustified attempt to roll back its requirements for the public reporting of workplace injuries and illnesses—information that allows states to better design enforcement, outreach, and training programs to improve workplace safety, and that enables employees to protect themselves from risks at work.

2.      In 2016, OSHA issued a rule requiring all large employers to submit information annually from three different workplace injury and illness tracking forms that employers were already required to maintain. That information, OSHA recognized, would help OSHA and states better target their workplace safety enforcement programs; encourage employers to abate these hazards; empower workers to identify risks and demand improvements; and provide information to researchers who work on occupational safety and health. And there was little downside—while some commenters had raised concerns about workers' privacy, OSHA planned to ensure there was no personally identifiable information contained within the tracking forms.

3.      Just three years later, OSHA reversed course. *See* Tracking of Workplace Injuries & Illnesses Rule, 84 Fed. Reg. 380 (Jan. 25, 2019) ("2019 Final Rule"). Suddenly, OSHA claimed that reporting of detailed workplace injury and illness information would not do much good, but it failed to adequately consider the benefits to states, employers, workers, and researchers that it had laid out in detail in 2016. And just as suddenly, OSHA now asserted that collection and disclosure of this information would undermine worker privacy, despite the ways the agency had already planned to address these concerns. Although many commenters—including some of the Plaintiff States—highlighted these fundamental flaws, OSHA dismissed them out of hand.

4.      In making this about-face, OSHA failed to provide the sufficient justification that the Administrative Procedure Act ("APA") demands. OSHA must "provide a reasoned explanation" for its action, which includes "show[ing] that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). That burden matters especially where the "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* at 2126 (quoting *FCC v. Fox*, 556 U.S. at 515-16). In promulgating the 2019 Final Rule, OSHA

did not even come close to justifying its views that the reporting of workplace injuries and illnesses has few benefits to states, workers, and researchers, or that it puts workers' privacy at risk. Because OSHA violated the APA, the Plaintiff States seek declaratory and injunctive relief vacating the 2019 Final Rule and preventing its implementation.

## JURISDICTION AND VENUE

5.      This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 553, 701–06. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

6.      This Court also has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201.

7.      Venue is proper in this Court because Defendants reside in this district and because a substantial part of the events giving rise to this action occurred in this district. *See* 28 U.S.C. § 1391(e)(1)(A), (B) & (C).

## THE PARTIES

8.      Plaintiff State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

9.      Plaintiff State of Illinois, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Kwame Raoul is the chief legal officer of the State of Illinois. *See* Ill. Const., Art. 5, § 15; 15 Ill. Comp. Stat. 205/4.

10.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that

threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

11.     Plaintiff Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Massachusetts' chief law enforcement officer and is authorized to pursue this action pursuant to Massachusetts General Law ch. 12, § 10.

12.     Plaintiff State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Keith Ellison is the chief legal officer of the State of Minnesota. Minn. Stat. § 8.01. This action is brought to protect Minnesota's sovereign, quasi-sovereign, and proprietary interests.

13.     Plaintiff State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

14.     In filing this action, the Attorneys General seek to protect the citizens and agencies of the Plaintiff States from harm caused by Defendants' illegal conduct, including harm to the Plaintiff States' sovereign, quasi-sovereign, and proprietary interests.

15.     Defendant R. Alexander Acosta is the Secretary of the U.S. Department of Labor. He is sued in his official capacity. His principal address is 200 Constitution Avenue, NW, Washington DC 20210.

16.     Defendant Loren Sweatt is the Acting Assistant Secretary of Labor for Occupational Safety and Health. She is sued in her official capacity. Her principal address is 200 Constitution Avenue, NW, Washington DC 20210.

17.     Defendant the U.S. Department of Labor is an executive agency of the United States of America. Its principal address is 200 Constitution Avenue, NW, Washington DC 20210.

18.     Defendant the Occupational Safety and Health Administration ("OSHA") is a component of the Department of Labor. Its principal address is 200 Constitution Avenue, NW, Washington DC 20210.

19.     Defendants Acosta and Sweatt are responsible for carrying out the duties of the Department of Labor and OSHA under the relevant statutes, including the Occupational Safety and Health Act.

## **BACKGROUND**

20.     Under the Occupational Safety and Health Act of 1970, OSHA is charged with assuring "safe and healthful working conditions" for all working men and women in the United States through various means, including setting "appropriate reporting procedures with respect to occupational safety and health." 29 U.S.C. § 651.

21.     The Act also empowers any state to "assume responsibility for development and enforcement . . . of occupational safety and health standards" relating to the same occupational health and safety issues covered by the Act. 29 U.S.C. § 667. To assume such responsibility, the state must submit (and OSHA must approve) a "State Plan" which provides standards "at least as effective in providing safe and healthful employment" as those developed by OSHA. *Id*. State Plans must have occupational injury and illness recording and reporting requirements that are "substantially identical" to those promulgated by OSHA. 29 C.F.R. § 1904.37(a). Currently, 28 states have OSHA-approved state plans, 22 of which cover private and public sector employers, and six of which exclusively cover public sector employers.

22.     In 2016, OSHA completed a thorough rulemaking aimed at improving the tracking of workplace injuries and illnesses. *See* Improve Tracking of Workplace Injuries & Illnesses, 81 Fed. Reg. 29,624 (May 12, 2016) ("2016 Rule").

23.     As part of the 2016 rulemaking process, OSHA considered the views of private businesses, industry groups, workers' organizations, unions, academics, state agencies, and private citizens as expressed in three stakeholder meetings and 1,820 comment letters.

24.     Because there had been "very limited information" publicly available about specific injuries and illnesses occurring in the workplace, 81 Fed. Reg. at 29,629, the 2016 Rule required employers with 250 or more employees to annually submit information electronically from three workplace injury and illness tracking forms. These forms are Form 300, Log of Work-Related Injuries and Illness, which provides information about each injury or illness, including date, location, job title, description of injury/illness, and outcome (employee names not submitted); Form 301, Injury and Illness Incident Report, which provides detailed information about the injury or illness and how it occurred, and the employer's line of business (employee name and address and name and address of doctor and treating facility not submitted); and Form 300A, Summary of Work-Related Injuries and Illnesses, which simply summarizes the total number, types, and outcomes of injuries and illnesses at the establishment. OSHA planned to make the injury and illness data publicly available through an online database after ensuring removal of all personally identifiable information.

25.     Prior to the 2016 Rule, employers were required to record and maintain all of the information recorded in Forms 300A, 300, and 301, and to make the forms available to OSHA or State inspectors upon demand. The 2016 Rule simply required employers with 250 or more employees to file the forms with OSHA electronically.

26.     As OSHA stated, the 2016 Rule was designed to allow OSHA and the public to "obtain a much larger data set of more timely, establishment-specific information about injuries and illnesses in the workplace." 81 Fed. Reg. at 29,629. OSHA anticipated several important benefits of the 2016 Rule.

27.     For OSHA itself, collection of the data would provide it with greater information about "the injury/illness risks facing workers in specific establishments" and would "increase[] the agency's ability to target those workplaces where workers are at greatest risk." *Id.*

28.     In addition, public access to the data would (1) encourage employers "to abate hazards and thereby prevent workplace injuries and illnesses without OSHA having to conduct onsite inspection," *id.*; (2) allow workers to "better identify hazards within their own workplace and take actions to have the hazards abated," *id.* at 29,630; (3) enable researchers to "identify patterns of injuries and illnesses that are masked by the aggregation of data" and "conduct rigorous studies that will increase our understanding of injury causation, prevention, and consequences," *id.* at 29,631; and (4) assist state "institutions charged with injury and illness surveillance" in better understanding emerging occupational hazards and in targeting their own programs, *id.*

29.     As part of its 2016 rulemaking, OSHA requested and received numerous comments on the privacy implications of collecting and publishing information from Forms 300 and 301, and it carefully considered them. Specifically, OSHA decided not to collect data from certain fields (employee names from Form 300, and names and addresses of employees and treating physicians and medical facilities from Form 301) because it determined that such data would create a risk of release of sensitive information without helping users identify workplace hazards. *Id.* at 29,660-61. OSHA also addressed commenters' concern that employees at small companies could be identified based on other information (such as job title or date of injury) by noting that only

establishments with 250 or more employees would be required to report detailed information. *Id.* at 29,662. As OSHA explained, "it is less likely that employees in such large establishments will be identified based on the posted recordkeeping data." *Id.*

30.     And in response to concerns that employers would accidentally include personally identifiable information in their descriptions of accidents and illnesses, OSHA noted that it could reduce the likelihood of errors on the front end by including instructions to employers not to include such personal or confidential information, and on the back end by segregating data received in encrypted format behind a separate firewall until sensitive fields had been scrubbed. *Id.* at 29,659 & 29,662-63.

31.     Pursuant to the 2016 Rule, OSHA was supposed to begin collecting the information on the Annual Summary Form 300A on July 1, 2017, and the more detailed information in Forms 300 and 301 on July 1, 2018.

32.     On June 28, 2017, just days before the first electronic submission deadline, OSHA proposed delaying submission of Form 300A. *See* 82 Fed. Reg. 29,261. On November 24, 2017, OSHA published a final rule delaying the deadline for filing Form 300A to December 15, 2017. *See* 82 Fed. Reg. 55,761.

33.     In or around May 2018, OSHA announced on its website, without posting a notice or proposed rule in the Federal Register, that it was suspending the requirement to submit Forms 300 and 301 and would not be accepting those forms. OSHA also announced its intent to issue a notice of proposed rulemaking to revise the 2016 Rule. *See Public Citizen Health Research Grp. v. Acosta*, No. 18-1729, -- F. Supp. 3d --, 2018 WL 6530580, at *2 (D.D.C. 2018).

34.     On July 25, 2018, three organizations—Public Citizen Health Research Group, the American Public Health Association, and the Council of State and Territorial Epidemiologists—

filed a complaint in the U.S. District Court for the District of Columbia challenging the decision to suspend provisions of the 2016 Rule without notice and comment. *See* Complaint, *Public Citizen Health Research Grp. v. Acosta*, No. 18-1729 (July 25, 2018). The court found the organizations had standing to challenge OSHA's action, but denied their request for a preliminary injunction. *See Public Citizen*, 2018 WL 6530580, at *2. That matter remains pending.

35.     On July 30, 2018, OSHA issued a notice of proposed rulemaking, Tracking of Workplace Injuries and Illnesses, 83 Fed. Reg. 36,494. In the proposed rule, OSHA maintained the requirement for employers to submit the summary information from Form 300A on an annual basis, but it removed the requirement to submit Forms 300 and 301, which contain more detailed information regarding workplace injuries and illnesses. OSHA stated that the proposal was based on the limited usefulness of the more detailed workplace injury and illness information, and based on its concern that forced or inadvertent disclosure of sensitive personal information from these forms would compromise worker privacy.

36.     OSHA received 1,880 comments on the proposed rule, including a comment letter filed on September 28, 2018, by the Attorneys General of New Jersey, Maryland, Massachusetts, New York, Pennsylvania, Rhode Island, and Washington ("State Attorneys General").

37.     On January 25, 2019, notwithstanding a partial government shutdown, OSHA published a final rule, Tracking of Workplace Injuries and Illnesses, 84 Fed. Reg. 380, in the Federal Register.

38.     In the Final Rule, OSHA failed to provide a reasoned explanation for reversing its position regarding the benefits and risks of requiring large employers to electronically submit information from Forms 300 and 301. OSHA now argues that the costs of collecting the detailed information outweigh the benefits of doing so. OSHA's reasons are not only unsupported factually,

but also plagued by logical contradictions. OSHA's explanations for the rule also fail to account for the many benefits of public disclosure that the commenters had raised.

39.     OSHA's reasoning is inconsistent. For example, OSHA claims it cannot make the data from the tracking forms publicly available because it needs to protect the confidentiality of its enforcement strategy. *Id.* at 383, 391. At the same time, however, OSHA claims that it does not need to collect the data from Forms 300 and 301 because it is not prepared to use this information in its enforcement efforts. *Id.* at 388-90. If OSHA does not intend to use this information as part of its enforcement efforts, disclosure of this information will not compromise those efforts.

40.     That is not the only example. OSHA has also determined that it will not make any of the data from these three tracking forms public. Yet, at the same time, OSHA asserts that it will no longer even collect the data from Forms 300 and 301 because of the expenses involved with removing sensitive information from these forms and because of the harm to workers' privacy if OSHA inadvertently leaves some sensitive information in. Obviously, however, OSHA would not need to incur the expense of systematically removing sensitive information from all forms received if OSHA is not going to make the forms public. *Id.* at 387, 399.

41.     OSHA also failed to adequately respond to comments by the State Attorneys General and others about the rule's benefits. For example, the State Attorneys General and others argued that OSHA ignored the ways the 2016 Rule would have bolstered the States' workplace health and safety enforcement and consultation activities. *See, e.g.*, Comments of State Attorneys General, Document ID 2028, pp. 3-6. OSHA baldly dismissed as "speculative" the States' contention that the data would be useful to states without State Plans, and did not address at all the States' argument that there would be benefits to a nationwide pool of information that an individual

state could not fully replicate by setting up its own database. *See* 84 Fed. Reg. at 394; Comments

of State Attorneys General, Document ID 2028, pp. 5-6.

42.     OSHA also failed to address the States' comments that the 2016 Rule would have

supported policy makers and researchers in their research, analysis, and advocacy work. OSHA

relied on the assumption that these benefits "would not materialize" because OSHA would not

make the data public, 84 Fed. Reg. at 391, despite the fact that most of the data is *not* confidential

or exempt from disclosure under FOIA, *see Public Citizen*, 2018 WL 6530580, at *9 ("[T]he Court

finds it highly unlikely that OSHA can withhold much of the information contained on Forms 300

and 301 submitted under the [2016 R]ule."). OSHA also asserted that researchers have access to

other sources of workplace injury and illness information, *id.* at 391, without acknowledging or

responding to the fact that the commenters *already* have access to these other data sources and had

explicitly told OSHA that the data from Forms 300 and 301 would *still* be important to their work,

*see id.* (citing multiple comment letters).

**Harm to the Plaintiff States Caused by the 2019 Rule**

43.     As a result of the 2019 Final Rule, there will not be a comprehensive, nationwide

requirement that all large employers submit detailed workplace injury and illness information to

OSHA. As a result, this information will not be available to OSHA, state agencies, researchers, or

the general public.

44.     The Plaintiff States have a proprietary interest in the ability of state agencies and

state universities to effectively fulfill their missions. Detailed and specific information regarding

workplace injuries and illnesses and the events surrounding them is necessary for policy makers,

program developers, and researchers in the Plaintiff States to understand the nature and causes of

the workplace injuries and illnesses that are occurring and to design their training, outreach, and

enforcement programs to effectively improve workplace safety and health. The Plaintiff States' proprietary interests are therefore directly harmed by the 2019 Final Rule.

45.     The Plaintiff States also have a quasi-sovereign interest in the health and safety of all their residents. Access to detailed and specific workplace illness and injury information is necessary for employers, employees, and the general public in the Plaintiff States to effectively abate and avoid workplace hazards, and lack of access to this data will impede efforts to improve workplace safety, resulting in harm to workers in the Plaintiff States. The Plaintiff States' quasi-sovereign interests are therefore also directly harmed by the 2019 Final Rule.

### *State of New Jersey*

46.     The State of New Jersey has a State Plan that covers public sector employers.

47.     Pursuant to 29 C.F.R. §§ 1902.7 and 1904.37 and N.J.S.A. 34:6A-30, New Jersey is required to adopt regulations that are substantially identical to injury and illness reporting and recording regulations adopted by OSHA.

48.     Due to OSHA's delays of the 2016 Rule and the litigation challenging it, as well as logistical and technological issues relating to the ability of OSHA's electronic reporting system to accept public sector forms, the New Jersey Department of Labor and Workforce Development ("NJLWD") has not yet adopted regulations comparable to the 2016 Rule. But NJLWD intended to adopt such regulations once these issues are resolved, and intended to have public sector employers electronically submit detailed and summary workplace injury and illness data to a central database where it will be available to further NJLWD's worker safety goals.

49.     New Jersey is one of 28 states with State Plans covering public sector employers. Under the 2016 Rule and State Plan states' substantially identical regulations, NJLWD anticipated using the detailed injury and illness data that would have been collected from public sector

employers in all 28 states with State Plans covering public sector employers to better analyze workplace safety trends and specific hazards, establish strategic plans, and prioritize enforcement efforts to target high-risk occupations and common preventable injuries.

50.    In addition to conducting inspections of and outreach to public sector employers under the State Plan, NJLWD also provides a free On-Site Consultation Service to public and private sector businesses. This program is funded jointly by OSHA and the State of New Jersey, and provides confidential consultations to help private and public employers identify hazards and improve safety management systems at their workplaces. NJLWD anticipated using the detailed injury and illness data that would have been collected from private and public sector employers under the 2016 Rule to better target the outreach, hazard identification, and training provided as part of the On-Site Consultation Program.

51.    Because the summary data from Form 300A includes little information about the types of injuries and illnesses reported and no information about their causes, it is insufficient for the purposes for which NJLWD intended to use the detailed information from Forms 300 and 301. Therefore, the 2019 Final Rule will undermine NJLWD's efforts to fulfill its duties under state and federal law and to protect the health and welfare of New Jersey's workers. New Jersey is thus directly harmed by the 2019 Final Rule.

52.    That is not the only harm New Jersey will experience. Rutgers, the State University of New Jersey, is New Jersey's premier public research university. The Rutgers School of Public Health has approximately 350 students and 130 faculty members. The School of Public Health includes the Center for Public Health Workforce Development, which delivers occupational safety and health training to private and public sector employers and workers. The detailed injury and illness information from Forms 300 and 301 would have allowed the Center for Public Health

Workforce Development to better understand the injuries and illnesses that are having the greatest impact on workers in New Jersey, and to develop better training programs that would address these concerns and improve worker health and safety. The data from the forms would also allow the Center to evaluate the effectiveness of prevention efforts by comparing rates of specific injuries and illnesses over time.

53. The New Jersey Safe Schools Program, also part of the Rutgers School of Public Health, provides occupational health and safety surveillance and training for students and adults in all approved public, private, and charter school career and technical education programs in New Jersey. Access to the detailed injury and illness data from Forms 300 and 301 would allow the Safe Schools Program to better understand the hazards at the public and private worksites where New Jersey students are placed. Likewise, the data would allow the Safe Schools Program to design training programs and worksite evaluation guidelines that better target the most serious workplace hazards.

54. In addition to their engagement in the work of the various centers, programs, and institutes, Rutgers School of Public Health faculty are also researchers and research mentors for undergraduate and graduate students in the field of occupational health and safety. The detailed injury and illness information from Forms 300 and 301 would be directly relevant to their research, and inability to access this data limits the effectiveness of their research and the types of research that can be conducted.

55. Finally, access to data from Forms 300 and 301 would have made public and private workplaces in New Jersey safer and healthier due to the use of the data by NJLWD and Rutgers, among others, to design more effective workplace injury and illness prevention programs. The health, safety, and welfare of New Jersey's residents is therefore harmed by the 2019 Final Rule.

*State of Illinois*

56.     The State of Illinois has a State Plan that covers public sector employers.

57.     The Illinois Department of Labor ("IDOL"), through its Division of Occupational Safety and Health, protects the health and safety of Illinois public employees through the inspection, investigation, and evaluation of public facilities and working conditions. To conduct these public-sector enforcement activities, IDOL employs safety and health inspectors.

58.     Additionally, IDOL conducts a safety and health consultation program for both public and private sector employers to help Illinois businesses and workplaces meet all state and federal OSHA health and safety laws and regulations.

59.     In early June 2018—after review of the 2016 Rule—IDOL notified all state and local government agencies in Illinois that they were required to comply with the new reporting requirements by electronically submitting injury and illness data via OSHA's Injury Tracking Application online portal.

60.     IDOL reasonably expected to use the injury and illness data collected from public sector employers across the country under the 2016 Rule to better focus its attention and resources on the most prevalent types of injuries and illnesses in the most hazardous public occupations and workplaces in Illinois.

61.     IDOL also reasonably anticipated using the more detailed injury and illness data collected under the 2016 Rule to better promote safety and health values in public sector workplaces in Illinois by engaging in targeted outreach, hazard identification, and improved training made possible by more robust injury and illness data. Similarly, IDOL reasonably would have used the data from the 2016 Rule—collected from private employers—to improve the training and education it provides to private employers through on-site health and safety consultations.

62.     Moreover, the rescission of the 2016 Rule deprives the many researchers and educators at Illinois state universities of important workplace safety data to be used in research, training, and scientific advancement in the areas of occupational health and safety, accident prevention, environmental health and safety, engineering, public health, and related fields of study.

63.     In filing this action, the Illinois Attorney General seeks to protect the agencies, businesses, public research universities, and residents of Illinois from the harm caused by Defendants' unlawful rollback of the 2016 Rule. Defendants' actions in adopting the 2019 Final Rule deprive Illinois agencies, employers, researchers, and employees of critical information needed to promote and protect their health and safety at work—information that is only available through widespread collection of the data on Forms 300 and 301. Thus, Illinois is directly harmed by the 2019 Final Rule.

### *State of Maryland*

64.     Maryland has a State Plan, administered by Maryland Occupational Safety and Health ("MOSH"), that covers state and local government and most private employers. MOSH's mission is to promote and assure workplace safety and health while reducing workplace fatalities, injuries and illnesses. MOSH achieves its mission through inspections, consultation services, outreach, education, and cooperative programs. MOSH is funded jointly by OSHA and the State of Maryland.

65.     MOSH could have used the detailed injury and illness information from Forms 300 and 301 to, among other things, efficiently identify hazard trends in Maryland workplaces and prioritize enforcement efforts. The 2019 Final Rule harms Maryland by depriving MOSH of access to this data.

66.     The 2019 Final Rule also harms Marylanders because it deprives prospective employees of information that would allow them to assess the safety records of their prospective employers and make an informed employment decision. The data also would have allowed current employees to accurately evaluate their employer's safety record and compare it to peer employers. The unavailability of data from Forms 300 and 301 due to the 2019 Final Rule thus removes an incentive for Maryland employers to invest in workplace safety improvements. The 2019 Final Rule also harms Marylanders because it deprives Maryland businesses of safety information related to both in-state and out-of-state entities. If the Form 300 and 301 safety information were publicly available, it could improve workplace safety in Maryland by encouraging Maryland businesses to contract with businesses with superior health and safety records. The data would also allow both public health agencies and private employers in Maryland to gauge whether workplace safety initiatives have been effective.

67.     Additionally, the University of Maryland, including the School of Medicine's Division of Occupational and Environmental Medicine, conducts research on the prevention of occupational illness and injuries and performs hazard assessments for employers. The 2019 Final Rule harms Maryland by depriving those researchers of a rich data set directly relevant to their area of study.

### *Commonwealth of Massachusetts*

68.     The Commonwealth of Massachusetts has a quasi-sovereign interest in the health and safety of its residents, including its workforce. The 2019 Final Rule will have an adverse impact on the health and safety of those workers and will also cause direct financial harm to Massachusetts.

69.     The Commonwealth of Massachusetts is required under M.G.L. c. 149, § 6 ½ to adopt regulations for the protection of public employees consistent with OSHA requirements. Pursuant to Executive Order 511 and continued under 454 CMR 25.00, an appointed advisory board is required to review recommendations by the Massachusetts Department of Labor Standards ("DLS") and State Human Resources Division to implement regulations that provide at least the level of protection to public employees as are provided under the federal Occupational Safety and Health Act of 1970, 29 U.S.C. chapter 15. In addition to the implementation of regulations, DLS is tasked with enforcing the statute and relevant regulations.

70.     Under the statute and regulations, the governor is required to appoint an occupational health and safety hazard advisory board. The goal of the advisory board is to evaluate illness and injury data, recommend training and implementation of safety and health measures, monitor the effectiveness of health and safety measures, and determine where additional resources are needed to protect the safety and health of the employees of the Commonwealth. The advisory board is administratively managed by the DLS and does not have the resources to create their own database; they must rely on existing data sources. Currently, the data utilized by the advisory board come from workers' compensation reporting and is not complete. These data do not include information related to injury causation and little information related to types of injuries and illnesses. Under the 2016 Rule, the OSHA data would have allowed the advisory board to perform a more complete analysis of causation, frequency, and severity of injuries, which is reported in the board's Annual Report and utilized to conduct workplace injury prevention programs.

71.     The Annual Report and other analyses of the OSHA data would also have allowed DLS to target recommendations to state and municipal agencies in order to decrease the occurrence of workplace injuries and illnesses, thus decreasing the state funds spent on claims and municipal

insurance costs related to them. Without the data in Forms 300 and 301, all that can be relied on is national trends and a limited state-specific data source, which is not enough information to appropriately target problem areas. The detailed illness and injury data would exponentially improve the ability of the advisory board to address specific issues and focus compliance efforts to address the areas of concern.

72.     According to the 2018 Massachusetts Occupational Health and Safety Advisory Board Report, Massachusetts spent $40,000,000 in Fiscal Years 2010 through 2012 on medical and wage replacement costs associated with workplace injuries and illnesses among Massachusetts' Executive Branch employees.

73.     The 2019 Final Rule will have a direct financial impact on Massachusetts because of the current inability to appropriately target prevention efforts and therefore decrease state and municipal costs related to workplace injuries and illnesses.

74.     DLS also provides a free federal and state-funded On-Site Consultation service for small to mid-sized businesses to help them recognize and control potential safety and health hazards. The Consultation Program uses data to market its services to businesses with known or likely hazards. With greater availability of data, new and expanded opportunities for targeted outreach and tailored dissemination of information are possible, thereby empowering employers to identify and mitigate hazards and boost compliance assistance efforts.

75.     The lack of this data also inhibits the appropriate resource targeting of OSHA, which impacts all private sector employees in Massachusetts. In addition to OSHA targeting, part of the original intention of the 2016 Rule was to allow public and private sector employers and employees to protect their own interests and processes by reviewing the available data. The lack of aggregated data availability from Forms 300 and 301 inhibits businesses and workers in

Massachusetts from effectively analyzing the injury and illness performance at their workplaces, gauging dangers and making improvements to safety. In addition, if the data were available, it would allow comparison with consolidated peer data, which is not possible now.

76.     Additionally, the data analysis would allow both public health agencies and private employers in Massachusetts to determine if workplace safety initiatives have been effective. Currently, that analysis is overly onerous, time-consuming, and inconsistent, given the limited data collected and disseminated to the public.

77.     Another state-run program affected by the 2019 Final Rule's rollback of the 2016 Rule is the Massachusetts Occupational Health Surveillance Program ("OHSP"), a program within the Massachusetts Department of Public Health's Bureau of Community Health and Prevention. OHSP's goal is to develop effective workplace illness and injury prevention strategies. OHSP's work is driven by data, which is utilized to guide the development of technology, educational resources and regulatory/policy change. Currently, OHSP has to rely on the minimum data available for Massachusetts industries from the small Massachusetts sample from the Bureau of Labor Statistics annual survey. The data are inadequate to assess risk and trends with any specificity, which inhibits OHSP's ability to perform the essential functions of its mandate. The detailed information from Forms 300 and 301 would greatly enhance OHSP's ability to conduct Massachusetts-based analysis and develop programs specific to the Commonwealth to improve workplace safety. Without access to the data from Forms 300 and 301, Massachusetts will be forced to expend resources to independently gather and report data, a direct financial harm to the Commonwealth.

78.     In addition to public agencies, multiple privately-run health and safety organizations in Massachusetts also utilize available occupational health and safety data analysis

on a daily basis. One organization that utilizes the OHSP and DLS data is the Massachusetts Nursing Association ("MNA"). The MNA, which is an advocate for workers in nursing and healthcare in Massachusetts, uses the data to develop programs for nurses to prevent hazardous working conditions. According to the most recent available Survey of Occupational Injury and Illness data, the nursing care and residential facility industry is one of the most injury and illness prone in Massachusetts. In order for the MNA to appropriately target specific areas of concern and develop programming to address those areas, more comprehensive data analysis is necessary. The data from Forms 300 and 301 would allow the development and effective analysis of prevention efforts.

79.     In addition to the MNA, the Massachusetts Coalition for Occupational Safety and Health ("MassCOSH"), also utilizes data analysis extensively in their work. One of MassCOSH's primary responsibilities is to hold employers in Massachusetts accountable for workplace injury and illness. In order to do so, MassCOSH needs to know more about what is hurting and injuring Massachusetts' workers at their jobs. From the data, MassCOSH could identify trends in workplace illness and injury, which could be addressed at a more systemic level. Without the comprehensive data included in the Forms 300 and 301, MassCOSH cannot address the injuries and illnesses that are having the most impact on workers in Massachusetts.

80.     Many private and public universities in Massachusetts that offer coursework and degrees in the areas of epidemiology, industrial hygiene, and occupational ergonomics are also affected by the 2019 Final Rule. These programs would be drastically improved with the increased availability of OSHA data with a universal coding structure. Currently, academics and researchers must travel to OSHA headquarters in Washington, D.C. to review the data that does exist. With the more extensive data from Forms 300 and 301, and more public availability of that data (along

with the universal coding structure), education and research abilities would be dramatically improved at these universities. The information on the forms is directly relevant to their research and coursework. The lack of such data has significantly hindered their ability to educate students and perform appropriate data analysis, impacting both student training and the ability to understand the illnesses and injuries that most affect Massachusetts' workforce. Additionally, access to the Forms 300 and 301 data would decrease the amount of spending necessary to independently collect such data, reducing Massachusetts' expenses at the public universities. Thus, Massachusetts is directly harmed by the 2019 Final Rule.

### *State of Minnesota*

81.     Minnesota is one of 22 states with an OSHA-approved workplace safety and health plan covering both private and public sector workers.

82.     The Occupational Safety and Health Division ("MnOSHA") of the Minnesota Department of Labor and Industry ("MnDLI") conducts inspections to ensure that employers follow workplace safety rules, conducts outreach to employers to improve workplace safety, and provides free in-person workplace safety consultation visits. MnOSHA is funded jointly by OSHA and the State of Minnesota.

83.     After the U.S. Department of Labor issued the 2016 Rule, MnOSHA acted pursuant to its obligation to maintain an occupational safety and health program substantively equal to OSHA's program. *See* 29 C.F.R. §§ 1902.7, 1904.37, and Minn. Stat. § 182.655.

84.     MnDLI and MnOSHA are required to comply with the rulemaking requirements set forth by the Minnesota Administrative Procedure Act and the Minnesota Occupational Safety and Health Act of 1973. Minn. Stat. §§ 14.03, 182.655. MnDLI complied with these requirements and published a rule on May 24, 2018 adopting the 2016 Rule.

85.     MnOSHA anticipated using the detailed injury and illness data from Forms 300 and 301 that OSHA committed to collect and publish in order to help identify and address injury and illness trends in Minnesota early or before those trends appeared in Minnesota workplaces.

86.     MnOSHA also anticipated using the detailed injury and illness data to better target outreach to regulated parties and improve in-person workplace safety consultation visits.

87.     MnDLI also maintains a Research and Statistics Unit. The Research and Statistics Unit currently utilizes Workers' Compensation data to inform policy discussions, rulemaking, education and information campaigns, and strategic planning. The data that would have been gathered and available to MnDLI's Research and Statistics Unit via the Form 300 and 301 data would have been broader, more detailed, and would have provided a more accurate and complete view of workplace safety and health in Minnesota and nationally than is available from the Workers' Compensation data.

88.     MnDLI's Research and Statistics Unit currently conducts a limited sample of the OSHA Forms 300, 300A, and 301 for an annual Survey on Occupational Injuries and Illnesses. The survey information is limited to a sample of employers from select industries. The information available to MnDLI's Research and Statistics Unit through the nationwide data from Forms 300 and 301 would have been invaluable to MnDLI's research and planning related to overarching issues of workplace health and safety in Minnesota. MnDLI and MnOSHA are thus harmed by the 2019 Final Rule.

89.     The 2019 Final Rule harms Minnesotans because it deprives workers of safety information that could help those workers select employers who maintain workplaces with superior health and safety records. The 2019 Final Rule also harms Minnesotans because it deprives Minnesotan businesses of safety information related to both in-state and out-of-state

entities. If the Form 300 and 301 data were publicly available, it could improve workplace safety in Minnesota by encouraging Minnesotan businesses to contract with businesses with superior health and safety records.

90.     The 2019 Final Rule harms Minnesota because it deprives institutions, such as the University of Minnesota's Midwest Center for Occupational Health and Safety and the Upper Midwest Agricultural Safety and Health Center, of access to data needed to protect the health and safety of workers across all industries and especially farmworkers. These two centers are focused on conducting research on worker health and safety, educating occupational health and safety practitioners and researchers, and providing outreach to workers and employers about best practices. Injury and illness data provided on OSHA Forms 300 and 301 and then published and shared is essential for understanding whether workplaces are getting safer, and which risk factors for injury and illness need investigation to identify prevention and control measures. This information is vital to the health and safety of Minnesota's workforce, and would help employers and researchers understand the link between workforce health and safety and productivity, and promote informed risk management decisions.

### *State of New York*

91.     The State of New York has a quasi-sovereign interest in the health and safety of its residents, including workers in its State. Worker advocates in New York would have used the detailed injury and illness information from Forms 300 and 301 in their health and safety advocacy, and inability to access this data will have an adverse effect on the effectiveness of their advocacy and worker protection efforts, and consequently, on the health and safety of New York's workers.

92.     The Occupational Health Surveillance Program ("OHSP"), part of the New York State Department of Health, gathers and provides information to workers and advocates on

workplace illnesses and injuries in New York. OHSP tracks patterns of work-related injuries, illnesses, and fatalities; implements interventions that will reduce future risks; collaborates with partners to identify methods to modify work practices to make them safer; and shares this information with workplaces that contain similar risks. OHSP's researchers, epidemiologists, and outreach specialists would use the dataset of detailed illness and injury information from Forms 300 and 301 to design targeted interventions in high-risk worker populations. OHSP does not otherwise have access to the quantity and quality of information that the 2016 Rule would have made available. Without such access, OHSP relies on more limited data sets, including the summary information presently available through OSHA, as well as hospital emergency room reports that OHSP gathers from New York hospitals. Access to the data collected on Forms 300 and 301 would reduce the cost of data collection and allow OHSP to expend fewer state funds on research and public education. The 2019 Final Rule thus directly harms New York's OHSP, both financially and in terms of the efficacy of OHSP's efforts to protect workers in New York.

93.    As a result of the rollback of the 2019 Final Rule, New York's research institutions will lose access to information that would have been valuable and important to their work. The City University of New York ("CUNY") is the largest urban university system in the United States, and more than half of its funding comes from the State of New York. CUNY houses the Graduate School of Public Health and Health Policy and the Barry Commoner Center for Health and Environment at Queens College. Researchers at these institutions planned to use the dataset of detailed illness and injury information from Forms 300 and 301 to track specific industries and develop interventions to target specific worker populations. Without access to this data, researchers cannot accurately pinpoint causes of workplace injuries to develop specific interventions.

94.     Researchers at these institutions do not otherwise have access to the breadth of information that would have been available under the 2016 Rule. Without such access, they are required to rely on alternative, more costly, and/or less comprehensive sources of illness and injury data. Public access to the data collected on Forms 300 and 301 would reduce the costs of data collection, allow researchers at state universities to write smaller grant proposals, and lead to lower expenditures of state funds on research. The 2019 Final Rule thus directly harms New York's public universities, both financially and in terms of the efficacy of their efforts to protect workers in New York.

95.     The New York State Office of the Attorney General ("NYSOAG") is the sole entity with authority to enforce New York State's "Right to Know" ("Right to Know") laws. New York State Labor Law §§ 882, 878. The Right to Know laws require that non-federal public employees in New York receive health and safety training for toxic substances employees are routinely exposed to on the job. New York State Labor Law § 878; 12 NYCRR § 820.4. NYSOAG may seek a civil penalty of up to $10,000 and injunctive relief for a violation of the Right to Know requirements; an intentional violation constitutes a misdemeanor punishable by imprisonment for up to 90 days and a $1000 fine. Labor Law § 882. NYSOAG anticipated using the detailed injury and illness data that would have been collected from public and private sector employers to better analyze trends concerning exposure to dangerous toxic substances in the workplace, to establish strategic plans, and to better target its enforcement efforts toward employers that may not be complying with their obligations under the Right to Know laws. Because the summary data from Form 300A contains no information about which toxic substances have caused illnesses or injuries, it is insufficient for the purposes for which NYSOAG intended to use the detailed information from Forms 300 and 301. Therefore, NYSOAG's efforts to fulfill its duties under New York State

law to protect covered employees from toxic substances in their workplaces will be undermined by the 2019 Final Rule. The 2019 Final Rule thus directly harms the New York State Office of the Attorney General.

## CAUSE OF ACTION

### Substantive Violation of the Administrative Procedure Act

96.     The Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

97.     The 2019 Final Rule is a final agency action.

98.     Under the APA, courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

99.     An agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

100.    The agency must "consider and respond to significant comments received during the period for public comment." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).

101.    An agency must "provide a reasoned explanation" for its decisions—including for its change of position—which includes "show[ing] that there are good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *FCC v. Fox*, 556 U.S. at 515). That burden matters especially where the "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* at 2126 (quoting *FCC v. Fox*, 556 U.S. at 515-16).

102.    The 2019 Final Rule is arbitrary and capricious because:

a. Defendants failed to consider important aspects of the issue, such as the benefits of the detailed workplace illness and injury data to the States and the public as discussed in the 2016 Rule and the comment letters;

b. Defendants' explanation for their decision to adopt the Rule, and for their determination that the costs and risks of collecting the detailed workplace injury and illness data outweigh the benefits of doing so, is contrary to the evidence that was before them; and

c. Defendants failed to provide adequate responses to comments of the State Attorneys General and others about the benefits of the information that OSHA will no longer collect, as well as the comments supplying alternative means of addressing worker privacy concerns.

103.    The 2019 Final Rule is also arbitrary and capricious because Defendants failed to provide an adequately reasoned explanation for their departure from the positions taken in the 2016 Rule, including their assessment of the value of the detailed workplace injury and illness data and the risks and costs of collecting that data.

104.    Because Defendants failed to comply with the APA's requirements and took a final action that is arbitrary, capricious, and an abuse of discretion, the 2019 Final Rule should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff States request that this Court enter judgment in their favor and grant the following relief:

a. Declare the 2019 Final Rule unlawful;

b. Vacate the 2019 Final Rule;

c. Permanently enjoin the application of the 2019 Final Rule;

d.  Order OSHA to immediately implement all aspects of the 2016 Rule;

e.  Award the Plaintiff States reasonable costs, including attorneys' fees; and

f.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  March 6, 2019

GURBIR S. GREWAL
Attorney General of New Jersey

s/ *Glenn J. Moramarco*
GLENN J. MORAMARCO
JEREMY FEIGENBAUM
Assistant Attorneys General
ELSPETH FAIMAN HANS
(admitted 1/24/2019)
ERIC APAR
(admitted 2/28/19)
Deputy Attorneys General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.Moramarco@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

KWAME RAOUL
Attorney General of Illinois

s/ *Harpreet Khera*
HARPREET KHERA
Deputy Bureau Chief
ELIZABETH ROBERSON-YOUNG
Public Interest Counsel
AARON WENZLOFF
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601
(312) 814-3000
AWenzloff@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

Brian E. Frosh
Attorney General of Maryland

s/ *Leah J. Tulin*
Leah J. Tulin
Jeffrey P. Dunlap
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7906
ltulin@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALY
Attorney General of Massachusetts

s/ *Amy L. Goyer*
AMY L. GOYER
Assistant Attorney General
Massachusetts Attorney General's Office
105 William Street
New Bedford, MA 02740
(617) 963-2319
Amy.Goyer@mass.gov
*Attorneys for Plaintiff Commonwealth of*
*Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

s/ *Christie B. Eller*
CHRISTIE B. ELLER
Deputy Attorney General of Minnesota
JONATHAN D. MOLER
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
St. Paul, MN 55101-2127
(651) 757-1330
jonathan.moler@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

LETITIA JAMES
Attorney General of New York

s/ *Matthew Colangelo*
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
D.C. Bar No. 997893
RENIKA MOORE
Bureau Chief, Labor
MICHAEL HIGGINS
AMY SCHNEIDER
JULIE R. ULMET
Assistant Attorneys General
28 Liberty St., 15th Floor
New York, NY 10005
(212) 416-6305
Matthew.Colangelo@ag.ny.gov
*Attorneys for Plaintiff the State of New York*