**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW JERSEY; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MINNESOTA; and STATE OF NEW YORK,

                Plaintiffs,

          v.

R. ALEXANDER ACOSTA; LOREN SWEATT; UNITED STATES DEPARTMENT OF LABOR; and OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION,

                Defendants.

**Civil Action No. 19-621-TJK**

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**Gurbir S. Grewal**
Attorney General of New Jersey
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

Glenn J. Moramarco (D.D.C. Admission 2/27/2019)
Assistant Attorney General
Elspeth Faiman Hans (D.D.C. Admission 1/24/2019)
Deputy Attorney General
Glenn.Moramarco@law.njoag.gov
Elspeth.Hans@law.njoag.gov
(609) 376-3232
*Attorneys for State of New Jersey*
*(additional counsel for plaintiffs listed on signature page)*

## TABLE OF CONTENTS

Introduction.................................................................................................................. 1

Statement of Facts ........................................................................................................ 3

    A.  The Occupational Safety and Health Act ...................................................... 3

    B.  The 2016 Electronic Reporting Rule ............................................................ 5

    C.  Delay of Electronic Reporting Requirements............................................... 7

    D.  The 2019 Rollback Rule ............................................................................... 7

    E.  The Parties .................................................................................................... 9

    F.  Procedural History........................................................................................ 9

Standard of Review..................................................................................................... 10

Argument .................................................................................................................... 11

    I. OSHA'S REASONING REGARDING THE COSTS AND BENEFITS OF PUBLIC DISCLOSURE OF THE DATA IS INCONSISTENT. .................................. 13

    II. OSHA'S REASONING REGARDING THE COSTS OF COLLECTING THE FORM 300 AND 301 DATA IS FLAWED. .................................................... 16

    A.  OSHA Failed To Provide An Adequate Justification To Support Its Position That Worker Privacy Is Significantly Threatened By The Collection Of Data From Forms 300 and 301.................................................................................................. 16

    B.  OSHA Based Its Assumed Costs On An Unreasonably High Standard Unsupported By The Record. ......................................................................................... 18

    C.  OSHA Failed To Provide Adequate Notice Of Its New Assessment Of The Costs Of Review And Redaction. ................................................................................... 20

    III.OSHA'S REASONING REGARDING THE BENEFITS OF COLLECTING THE FORM 300 AND 301 DATA IS FLAWED. .................................................... 22

    A.  OSHA Unreasonably Ignored or Dismissed Significant Record Evidence Of The Benefits Of The Detailed Data. ................................................................................ 22

    B.  OSHA Inconsistently Asserts That Making Any Data Public Would Harm Its Enforcement Efforts, While Simultaneously Insisting That It Does Not Plan to Use The Form 300 And 301 Data For Enforcement Purposes................................................. 26

CONCLUSION............................................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Air Transportation Association of America v. Department of Transportation*,
119 F.3d 38 (D.C. Cir. 1997) ................................................................................. 13

*Allina Health Services v. Sebelius*, 746 F.3d. 1102 (D.C. Cir. 2014) .......................... 20

*Allina Health Services v. Sebelius*, 904 F. Supp. 2d 75 (D.D.C. 2012) ....................... 21

*Association of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427
(D.C. Cir. 2012) ...................................................................................................... 18

*Brodie v. U.S. Department of Health & Human Services*, 796 F. Supp. 2d 145
(D.D.C. 2011) .......................................................................................................... 10

*City of Kansas City, Missouri v. Department of Housing & Urban Development*,
923 F.2d 188 (D.C. Cir. 1991) ................................................................................ 18

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28
(D.D.C. 2019) .......................................................................................................... 24

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ...................................... 10

*Federal Communications Commission v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................ 10, 18

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm
Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ...................... 10, 11, 15, 18

*Natural Resources Defense Council v. Securities & Exchange Commission*,
606 F.2d 1031 (D.C. Cir. 1979) .............................................................................. 10

*Natural Resources Defense Council v. U.S. Nuclear Regulatory Commission
(NRDC)*, 879 F.3d 1202 (D.C. Cir. 2018) ......................................................... 11, 13

*Public Citizen Health Research Group v. Acosta*, 363 F. Supp. 3d 1 (D.D.C. 2018) ........ 7, 15, 16

*U.S. Department of State v. Washington Post Co.*, 456 U.S. 595 (1982) ..................... 16

**Statutes**

29 U.S.C. § 651 ................................................................................................................. 3

29 U.S.C. § 657 ................................................................................................................. 3

29 U.S.C. § 667 ................................................................................................................. 9

5 U.S.C. § 553 ............................................................................................................. 20, 21

5 U.S.C. § 706 ................................................................................................................. 10

**Regulations**

29 C.F.R. § 1904.29 .......................................................................................................... 4

29 C.F.R. § 1904.32 .......................................................................................................... 4

Improve Tracking of Workplace Injuries & Illnesses, 81 Fed. Reg. 29,624
    (May 12, 2016) ........................................................................................................ passim

Improve Tracking of Workplace Injuries & Illnesses: Proposed Delay of Compliance Date,
    82 Fed. Reg. 29,261 (June 28, 2017) (proposed rule) ................................................. 7

Tracking of Workplace Injuries & Illnesses, 83 Fed. Reg. 36,494 (July 30, 2018)
    (proposed rule) ............................................................................................ 1, 7, 8, 21

Tracking of Workplace Injuries & Illnesses, 84 Fed. Reg. 380 (Jan. 25, 2019)
    (final rule) .......................................................................................................... passim

**Other Authorities**

State Plans, U.S. Department of Labor, Occupational Safety & Health Administration,
    https://www.osha.gov/dcsp/osp/ ................................................................................ 9

**INTRODUCTION**

In 2016, the Occupational Safety and Health Administration ("OSHA") issued a final rule entitled Improve Tracking of Workplace Injuries and Illnesses, 81 Fed. Reg. 29,624 (May 12, 2016) ("Electronic Reporting Rule"). This rule required all large employers to submit information annually from three different workplace injury and illness tracking forms that employers were already required to maintain. That information, OSHA recognized, would help OSHA and states better target their workplace safety enforcement programs; encourage employers to abate these hazards; empower workers to identify risks and demand improvements; and provide information to researchers who work on occupational safety and health. When it promulgated the rule, OSHA stated that it would make the data publicly accessible on its website for these purposes, and that it would ensure that no personally identifiable information was released.

Only two years later, OSHA reversed course and decided not to collect information from the more detailed workplace injury and illness forms, effectively shielding it from the public eye. *See* Tracking of Workplace Injuries & Illnesses, 83 Fed. Reg. 36,494 (July 30, 2018) (proposed rule); 84 Fed. Reg. 380 (Jan. 25, 2019) (final rule) ("Rollback Rule"). The entire basis for the new rule is OSHA's sudden assessment that the costs of collecting the data (specifically, the risks to worker privacy) outweigh the benefits of such collection. But OSHA's assessment of these costs and benefits is internally inconsistent. On the one hand, OSHA claims that, if the data were collected, there would be a serious risk of workers' sensitive personal information being released, and OSHA would have to expend inordinate agency resources to review the data in order to protect against this. Obviously, these costs depend on an assumption that the data will ultimately be made public (whether by the agency voluntarily, or in response to court orders)—if there was no chance of disclosure, there would be no threat to privacy and no need for OSHA to spend resources removing personal information. On the other hand, when OSHA assesses the benefits of collecting

1

the data, it disregards the many benefits that workers, researchers, and the general public expected to gain from public access to the data on the ground that such benefits "would not materialize [b]ecause OSHA has determined publishing the data would do more harm than good." 84 Fed. Reg. at 391. In short, OSHA found, because the agency is *not* going to publicly release this data, the claimed benefits of collecting the data were overstated. The inconsistency is readily apparent: either data will not be made public, in which case OSHA does not need to consider the risk to worker privacy and the cost of reviewing the data, or data will be made public, in which case OSHA must consider all the benefits from public access to this information.

OSHA's rulemaking is plagued by other errors too. With respect to the costs of collecting the detailed data, OSHA fails to adequately explain why it now believes collection and publication of the data poses a serious threat to worker privacy, it embraces an unrealistic and unreasonable standard for protection of personal information that even the literature it relies on does not support, and it includes in the final rule an entirely new set of government costs that are more than ten times the costs discussed in the notice of proposed rulemaking. With respect to the benefits of collecting the detailed data, OSHA ignores the benefits of the data to the states (with whom it admits it would share the data) as well as workers, researchers, and businesses, and inconsistently argues that making the data public would harm its enforcement efforts while simultaneously asserting that it does not plan to use the data for enforcement purposes.

Because OSHA relied on inconsistent reasoning, failed to provide coherent explanations for its new positions, and ignored substantial evidence in the record, the Rollback Rule is arbitrary, capricious, and in violation of the Administrative Procedure Act ("APA"). The Plaintiff States therefore respectfully ask this Court to vacate the Rollback Rule.

## STATEMENT OF FACTS[1]

### A.  The Occupational Safety and Health Act

The Occupational Safety and Health Act of 1970 was enacted to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Among other means, Congress intended the Act to accomplish this goal "by encouraging employers and employees in their efforts to reduce the number of occupational health and safety hazards at their places of employment," by "stimulat[ing] employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions," "by providing for research in the field of occupational safety and health," "by developing innovative methods, techniques, and approaches for dealing with occupation safety and health problems," "by exploring ways to discover latent diseases, establishing  causal connections between diseases and work in environmental conditions, and conducting other research relating to health problems," and "by providing for appropriate reporting procedures with respect to occupational safety and health [that] will help achieve the objectives of [the Act] and accurately describe the nature of the occupational safety and health problem." *Id.*

The Act accordingly directs the Secretary of Labor to "prescribe regulations requiring employers to maintain accurate records of, and to make periodic reports on, work-related deaths, injuries and illnesses other than minor injuries." *Id.* § 657(c)(2). The Act further provides that, "in order to further the purposes" of the Act, the Secretary "shall develop and maintain an effective program of collection, compilation, and analysis of occupational safety and health statistics" and

---

[1] Plaintiffs allege unlawful agency action in violation of the APA. Therefore, pursuant to Local Civil Rule 7(h)(2), this memorandum includes a statement of facts with specific references to the administrative record in lieu of a separate statement of material uncontested facts. The statement of facts in this memorandum also contains general background information about the Electronic Reporting Rule and the Rollback Rule for the Court's convenience.

"shall compile accurate statistics on work injuries and illnesses, which shall include all disabling, serious or significant injuries and illnesses . . . other than minor injuries." *Id.* § 673(a). Similarly, the Act directs that employers "shall file such reports with the Secretary as he shall prescribe by regulation, as necessary to carry out his functions under [the Act]." *Id.* § 673(e).

OSHA first issued regulations requiring employers to record work-related injuries and illnesses in 1971. 81 Fed. Reg. at 26,624 (citing 36 Fed. Reg. 12,612 (July 2, 1971) and 29 C.F.R. § 1904.7). Specifically, employers with more than ten employees in most industries must maintain a log of all work-related injuries and illnesses using OSHA Form 300, and prepare an incident report with additional details about each case recorded in Form 300 using OSHA Form 301. *Id.* at 29,624; *see also* 29 C.F.R. § 1904.29. Employers are also required to prepare an annual summary of all injuries and illnesses at the establishment using OSHA Form 300A.[2] 81 Fed. Reg. at 29,624; 29 C.F.R. § 1904.32.

OSHA has required employers to keep these specific records since 2001. 81 Fed. Reg. at 29,625. However, for businesses in most industries, OSHA's only access to this information was during its on-site facility inspections.[3] *Id.* at 29,628-29. Between 1997 and 2012, OSHA also collected Form 300A from approximately 80,000 establishments (approximately 1% of establishments nationwide) in selected industries each year through the OSHA Data Initiative, but this program has been discontinued. *Id.* The Department of Labor's Bureau of Labor Statistics ("BLS") also collects occupational injury and illness data from a sampling of employers through

---

[2] All three forms, and instructions for their use, are available on OSHA's website at https://www.osha.gov/recordkeeping/RKforms.html.

[3] OSHA also receives immediate reports of fatalities and severe injuries involving hospitalization, amputation, or loss of an eye, but such events make up only a tiny fraction of workplace injuries and illnesses.

its annual Survey of Occupational Injuries and Illnesses and provides general statistics based on this data, but BLS may not release any establishment-specific information it collects to OSHA, states, or the public. *Id.* at 29,627-28. In sum, the result was that, despite requiring employers to collect substantial amounts of detailed information about workplace illnesses and injuries, OSHA itself—as well as public health researchers and the general public—only "ha[d] very limited information about the injury/illness risk facing workers in specific establishments." *Id.* at 29,629.

### B. The 2016 Electronic Reporting Rule

About three years ago, OSHA completed a thorough rulemaking aimed at improving the tracking of workplace injuries and illnesses. *See* Improve Tracking of Workplace Injuries and Illnesses, 81 Fed. Reg. 29,624 (May 12, 2016) ("Electronic Reporting Rule"). The Rule required employers with 250 or more employees to annually submit information electronically from Forms 300, 301, and 300A. The Rule was designed to allow OSHA and the public to "obtain a much larger data set of more timely, establishment-specific information about injuries and illnesses in the workplace." *Id*. at 29,629. OSHA foresaw that the data would provide it with greater information about "the injury/illness risks facing workers in specific establishments" and would "increase[] the agency's ability to target those workplaces where workers are at greatest risk." *Id.*

When it issued the Electronic Reporting Rule, OSHA planned to make the injury and illness data publicly available through an online database after ensuring the removal of personally identifiable information (such as names and social security numbers). *Id.* at 29,625 & 29,632. OSHA stated that public access to the data would have multiple benefits, including: (1) encouraging employers "to abate hazards and thereby prevent workplace injuries and illnesses without OSHA having to conduct onsite inspection," *id.*; (2) allowing workers to "better identify hazards within their own workplace and take actions to have the hazards abated," *id.* at 29,630; (3) enabling researchers to "identify patterns of injuries and illnesses that are masked by the

5

aggregation of data" and "conduct rigorous studies that will increase our understanding of injury causation, prevention, and consequences," *id.* at 29,631; (4) assisting state "institutions charged with injury and illness surveillance" in better understanding emerging occupational hazards and in targeting their own programs, *id.*; and (5) allowing investors, contracting entities, and customers to consider safety records in deciding which companies to work with, *id.*

As part of the rulemaking process, OSHA requested, received, and carefully considered comments on the privacy implications of collecting and publishing information from Forms 300 and 301. In response, OSHA decided not to collect data from certain fields (employee names from Form 300, and names and addresses of employees and treating physicians and medical facilities from Form 301) because it determined that such data would create a risk of release of sensitive information without helping users identify workplace hazards. *Id.* at 29,660-61. OSHA also addressed commenters' concern that employees at small companies could be identified based on other information (such as job title or date of injury) by noting that only establishments with 250 or more employees would be required to report detailed information. *Id.* at 29,662. As OSHA explained, "it is less likely that employees in such large establishments will be identified based on the posted recordkeeping data." *Id.* And in response to concerns that employers would accidentally include personally identifiable information in their descriptions of accidents and illnesses, OSHA noted that it could reduce the likelihood of errors on the front end by including instructions to employers not to include such personal or confidential information, and on the back end by segregating data received in an encrypted format behind a separate firewall until the data had been reviewed and scrubbed using "software that will search for, and de-identify, personally identifiable information." *Id.* at 29,659 & 29,662-63. Overall, OSHA assured commenters that it "has effective safeguards in place to prevent the disclosure of personal or confidential information contained in

6

the recordkeeping forms and submitted to OSHA." *Id.* at 29,661. OSHA also made other adjustments to the Electronic Reporting Rule in response to comments, such as requiring annual rather than quarterly reporting to reduce the burden on employers. *Id.* at 29,634.

### C.  Delay of Electronic Reporting Requirements

Pursuant to the Electronic Reporting Rule, OSHA was supposed to begin collecting the summary data from Form 300A on July 1, 2017, and the more detailed information in Forms 300 and 301 on July 1, 2018. 81 Fed. Reg. at 29,640. However, on June 28, 2017, just days before the first electronic submission deadline, OSHA proposed delaying submission of Form 300A. *See* Improve Tracking of Workplace Injuries and Illnesses: Proposed Delay of Compliance Date, 82 Fed. Reg. 29,261 (proposed rule). On November 24, 2017, OSHA published a final rule delaying the deadline for filing Form 300A to December 15, 2017. *See* Improve Tracking of Workplace Injuries & Illnesses: Proposed Delay of Compliance Date, 82 Fed. Reg. 55,761 (final rule). This rule did not alter any other deadlines from the Electronic Reporting Rule.

In May 2018, OSHA announced on its website, without posting a notice or proposed rule in the Federal Register, that it was suspending the requirement to submit Forms 300 and 301 and would not be accepting data from those forms. *See Pub. Citizen Health Research Grp. v. Acosta*, 363 F. Supp. 3d 1, 8 (D.D.C. 2018). OSHA also announced its intent to issue a notice of proposed rulemaking to revise the Electronic Reporting Rule. *Id.*

### D.  The 2019 Rollback Rule

On July 30, 2018, OSHA issued another notice of proposed rulemaking. *See* Tracking of Workplace Injuries & Illnesses, 83 Fed. Reg. 36,494. In the proposed rule, OSHA maintained the requirement for employers to submit Form 300A, but removed the requirement to submit Forms 300 and 301. 83 Fed. Reg. at 36,494. OSHA stated that the proposal was based on the limited usefulness of the more detailed workplace injury and illness information, and its concern that

7

forced or inadvertent disclosure of sensitive personal information from these forms would compromise worker privacy. *See id.*

OSHA received 1,880 comments on the proposed rule, including a comment letter filed on September 28, 2018, by the Attorneys General of seven states (including most of the Plaintiff States). Of the 1,880 comments, only approximately 45 supported OSHA's proposal to rescind the requirement to report data from Forms 300 and 301. Moreover, despite the fact that OSHA pointed to concerns about worker privacy as a primary reason for not collecting the detailed data, all the workers' advocacy organizations who submitted comments supported the Electronic Reporting Rule and opposed OSHA's proposal to scale back the reporting requirements. *See, e.g.*, 2019-AR00440; 2019-AR09451; 2019-AR00804; 2019-AR00974; 2019-AR00981; 2019-AR00986; 2019-AR00992; 2019-AR01007; 2019-AR01057; 2019-AR01214; 2019-AR01317; 2019-AR01354; 2019-AR01369; 2019-AR01441; 2019-AR01484; 2019-AR01487; 2019-AR01507; 2019-AR01512; 2019-AR01524; 2019-AR01543; 2019-AR01552; 2019-AR01631; 2019-AR01647; 2019-AR01650; 2019-AR01668; 2019-AR01682; 2019-AR01695; 2019-AR01698; 2019-AR01706; 2019-AR01713; 2019-AR01726; 2019-AR01731; 2019-AR01754; 2019-AR01766; 2019-AR01849; 2019-AR01922; 2019-AR02450; 2019-AR02522. Many of the comments opposing the rule provided detailed examples of how access to the data contained in Forms 300 and 301 would help workers, advocates, and researchers take actions to improve workplace safety and health. *See, e.g.*, 2019-AR00994; 2019-AR01057; 2019-AR01214; 2019-AR01317; 2019-AR01354; 2019-AR01369; 2019-AR01655; 2019-AR01799; 2019-AR01849; 2019-AR02450; 2019-AR02522.

On January 25, 2019, OSHA published a final rule, Tracking of Workplace Injuries and Illnesses, 84 Fed. Reg. 380 ("Rollback Rule"), in which it adopted the proposed rule without

8

modification and based its decision to do so on its assessment that the risks and costs of collecting the detailed information outweighed the benefits of doing so. *See* 84 Fed. Reg. at 383.

### E.  The Parties

The plaintiffs in this the matter are six sovereign states of the United States—the State of New Jersey, the State of Illinois, the State of Maryland, the Commonwealth of Massachusetts, the State of Minnesota, and the State of New York (collectively "Plaintiff States"). Some of the Plaintiff States have OSHA-approved "State Plans" and are responsible for establishing standards for occupational health and safety and enforcing those standards,[4] *see* 29 U.S.C. § 667, and all of the Plaintiff States have an interest in protecting the health and safety of their residents. Access to detailed and specific workplace illness and injury information is necessary for state agencies, researchers, employers, employees, and the general public to effectively abate and avoid workplace hazards, and lack of access to this data will impede efforts to improve workplace safety. The Plaintiff States and their residents are therefore harmed by the Rollback Rule, and an order from this Court vacating the rule will effectively redress that harm.

The defendants are the U.S. Department of Labor, the Occupational Safety and Health Administration, Secretary of Labor R. Alexander Acosta, and Acting Assistant Secretary of Labor for Occupational Safety and Health Loren Sweatt (collectively "OSHA").

### F.  Procedural History

The Rollback Rule was published in the Federal Register on January 25, 2019. *See* 84 Fed. Reg. 380. The Plaintiff States filed their complaint on March 6, 2019. On March 25, 2019, this

---

[4] Maryland and Minnesota have State Plans that cover all employees; New Jersey, Illinois, and New York have State Plans that cover only public sector employees. State Plans, U.S. Dep't of Labor, Occupational Safety & Health Admin., https://www.osha.gov/dcsp/osp/ (last visited May 23, 2019).

Court set a combined schedule for this matter and the related case of *Public Citizen v. Acosta*, No. 19-cv-166 (D.D.C.), in which the plaintiffs are three public health organizations (Public Citizen Health Research Group, Council of State and Territorial Epidemiologists, and American Public Health Association). Defendants served the administrative record on the plaintiffs on April 26 and May 3, 2019, and the plaintiffs now move for summary judgment.

## STANDARD OF REVIEW

A moving party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases involving a challenge to a federal agency's action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Brodie v. U.S. Dep't of Health & Human Servs.*, 796 F. Supp. 2d 145, 150 (D.D.C. 2011) (citing *Richards v. Immigration & Naturalization Serv.,* 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). "[R]eview of an agency's procedural compliance with statutory norms is an exacting one." *Natural Res. Def. Council v. Sec. & Exch. Comm'n*, 606 F.2d 1031, 1048 (D.C. Cir. 1979).

Pursuant to Section 706 of the APA, this court "shall hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that are promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). While agencies are, of course, "free to change their existing policies," the agency must provide a "reasoned explanation" for "why it deemed it necessary to overrule its previous position," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016), and "show that there are good reasons for the new policy," *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (noting an agency rescinding a rule must supply a reasoned

analysis for the change). In providing that explanation, "it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" *Natural Res. Def. Council v. U.S. Nuclear Regulatory Comm'n* (*NRDC*), 879 F.3d 1202, 1215 (D.C. Cir. 2018) (quoting *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir. 1997)). It is also unlawful for an agency to "entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation for its decision that runs counter to the evidence before [it]." *State Farm*, 463 U.S. at 43.

## ARGUMENT

During the 2016 rulemaking process, OSHA considered the views of private businesses, industry groups, workers' organizations, unions, academics, state agencies, and private citizens as expressed in three stakeholder meetings and 1,820 comment letters. OSHA found that the publicly available information about specific injuries and illness occurring in the workplace was "very limited," 81 Fed. Reg. 29,264, and that requiring the collection and disclosure of such information would improve worker health and safety. In particular, OSHA discussed in detail the ways in which the electronic collection and publication of establishment-specific injury and illness reports would benefit state and county governments, employees, potential employees, employers, researchers, workplace safety and health professionals, the general public, and even OSHA itself. *See* 81 Fed. Reg. at 29,629-32 & 29,647-48. OSHA also took steps to address any potential concerns about worker privacy by excluding all personally identifiable information from submission, and by instituting additional internal review procedures. *Id.* at 29,661-62.

In contrast to the extensive, thorough, and well-reasoned 2016 Rule, OSHA's decision to roll back these requirements and no longer collect or publish detailed workplace injury and illness data lacks the sufficient explanation and basis that the APA commands. At the core of OSHA's analysis lies a straightforward conclusion: that the costs of collection and disclosure of the detailed

11

workplace safety injury and illness data outweigh the benefits.[5] *See, e.g.*, 84 Fed. Reg. at 381. As a result, if OSHA's assessment of *either* the costs or the benefits is faulty, OSHA's entire analysis fails. And here, OSHA's reasoning is inescapably flawed with respect to both prongs. Most importantly, the agency's approach to calculating costs and benefits in this rule is internally inconsistent. When computing costs, OSHA highlights the potential harms to worker privacy that will occur if this workplace injury and illness information is disclosed publicly. And yet, on the other side of the ledger, OSHA claims that the benefits of collecting this data will never "materialize" for the public because it will not disclose this same information publicly. *Id.* at 391. That contradiction undermines OSHA's entire analysis. Unfortunately, that is not OSHA's only failure of reasoning. With respect to costs, OSHA also fails to justify its assessment of the degree of the risks to worker privacy; unreasonably requires a "100% guarantee" that no personal information would ever be released (although, inter alia, that is not the standard supported by the literature on which OSHA relies); and failed to provide notice of the costs associated with reviewing and redacting the data. And with respect to benefits, OSHA ignores substantial record evidence of benefits to the states and other entities; and inconsistently asserts that making data public would undermine its enforcement efforts while maintaining that it does not actually plan to use this data in its enforcement efforts anyway.

For any or all of these reasons, OSHA's inconsistent reasoning, failures of reasoning, and failures to consider the evidence before it make the Rollback Rule a textbook example of arbitrary

---

[5] Throughout this brief, we refer to the costs and benefits of collection, access to, and public disclosure of the detailed data from Forms 300 and 301 that OSHA planned to collect under the 2016 Electronic Reporting Rule. By contrast, in the Rollback Rule, OSHA generally refers to benefits and costs of the rule itself, and therefore labels protection of worker privacy and avoiding costs associated with data review as *benefits* of the Rule rather than costs.

and capricious agency action. This Court should thus hold the Rollback Rule unlawful and set it aside.

## I.    OSHA'S REASONING REGARDING THE COSTS AND BENEFITS OF PUBLIC DISCLOSURE OF THE DATA IS INCONSISTENT.

As noted above, "[o]f course, it would be arbitrary and capricious for the agency's decision making to be internally inconsistent." *NRDC*, 879 F.3d at 1215 (internal quotation marks omitted). And it is black letter law that, where an agency's reasoning is inconsistent, a court is "obliged therefore to vacate the rule and remand" to the agency for reconsideration of the issue. *Air Transp.*, 119 F.3d at 43.

That proves fatal to OSHA. In justifying the Rollback Rule, OSHA focuses on one specific cost of collecting and publishing the data—the harm to worker privacy that will flow from release of this workplace safety information. In particular, OSHA claims that the establishment-specific information about injuries and illnesses in the workplace it collects might inadvertently contain some personally identifiable information (even though the form makes clear that employers should not include this information). 84 Fed. Reg. at 384. Because this information may ultimately be released publicly, OSHA says, it must take extensive steps to guard against the disclosure of sensitive personally identifiable information or other information that could lead to re-identification contained in the Form 300 and 301 data. *Id.* at 400. According to OSHA, that would require a two-level manual review by an OSHA analyst and supervisor, at an annual cost of $7.5 million. *Id*. So OSHA instead decided not to collect this information at all because such extensive review would require it to "commit an unwarranted level of resources," *id.* at 387, and "would not be feasible," *id.* at 388. The risk of public disclosure was thus the basis for OSHA's decision to stop demanding this information.

13

But when it comes to the benefits of data, OSHA takes an inconsistent position. In the Electronic Reporting Rule, the agency had extensively discussed the benefits that the detailed data from Forms 300 and 301 would have for state governments, researchers, employees, employers, worker advocates, and the general public. *See* 81 Fed. Reg. at 29,629-32 & 29,647-48. Many of the comments OSHA received on the Rollback Rule also discussed the benefits of access to this data. *See, e.g.*, 2019-AR00994; 2019-AR01033; 2019-AR01057; 2019-AR01214; 2019-AR01317; 2019-AR01354; 2019-AR01369; 2019-AR01495; 2019-01631; 2019-AR01655; 2019-AR01709; 2019-AR01799; 2019-AR01849; 2019-AR02450; 2019-AR02522. Against all this, OSHA now simply asserts that any benefits of public access to the data "would not materialize. Because OSHA has determined publishing the data would do more harm than good . . . OSHA would not make the data public even if collected." 84 Fed. Reg. at 391. In other words, OSHA claims that, because it is *not* going to publicly release this information, the claimed benefits of collecting the data are overstated.

OSHA cannot have it both ways. On the one hand, OSHA repeatedly says it does not intend to make publicly available the data it collects or might have collected, including establishment-specific information from Forms 300 and 301. *See, e.g.*, 84 Fed. Reg. at 383, 391. If that is right, then what it says about costs is wrong: if OSHA is not going to make this information public, then it has no reason to worry about harms to worker privacy, and no reason to commit extensive resources to ensuring sensitive information is redacted. On the other hand, OSHA may be required to publicly disclose the information in response to Freedom of Information Act ("FOIA") requests or otherwise—a possibility that OSHA itself readily acknowledges in the Rollback Rule. *See, e.g.*, 84 Fed. Reg. at 381, 383, 386. If that is right, then what OSHA says about benefits is wrong: if disclosure is required by courts under FOIA, then many benefits of public access to the data will

14

indeed materialize and should have been considered by the agency. *See id.* at 391. Whatever the likely outcome, OSHA needs to treat the possibility of disclosure the same on both sides of the ledger.

OSHA's approach to this Court's decision in *Public Citizen*, 363 F. Supp. 3d 1, only adds to those inconsistencies. There, this Court indicated that most of the information (except personally identifiable information) in Forms 300 and 301 would not fall under any FOIA exemption and would be subject to disclosure. *Id.* at 15-17. In its final rule, OSHA cites this decision as evidence that courts may require it to publicly release the data that it collects from Forms 300 and 301, and thus as a reason why the agency needs to worry about risks to worker privacy. 84 Fed. Reg. at 386 (noting that "the court concluded that the plaintiffs would likely be entitled to a significant portion of the 300 and 301 data if collected by OSHA"). But that eviscerates OSHA's claim that the benefits of public access "would not materialize [b]ecause OSHA has determined publishing the data would do more harm than good." *Id.* at 391. And in fact, in its discussion of the benefits (or lack thereof) of collecting this data, OSHA nowhere mentions *Public Citizen*, or the possibility of disclosure under FOIA. If OSHA reads *Public Citizen* to likely require public disclosure, such that the purported costs will materialize, then OSHA cannot ignore *Public Citizen* when it says that the benefits of disclosure will *not* materialize.[6]

---

[6] In addition to being internally inconsistent, OSHA's failure to grapple with *Public Citizen* when it discusses its prediction that the benefits of public disclosure "would not materialize" shows that OSHA "entirely fail[ed] to consider an important aspect" of its rule and gave an explanation that "runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43. In *Public Citizen*, this Court indicated that most of the information (except personally identifiable information) in Forms 300 and 301 does not fall under any FOIA exemption and would subject to disclosure. 363 F. Supp. 3d at 15-17. Commenters raised this fact before the agency, and OSHA itself cited this decision in its rulemaking. *See* 84 Fed. Reg. at 386. OSHA thus needed to explain why *Public Citizen* did not control its assessment of the benefits of public disclosure. That failure was arbitrary and capricious.

If anything, OSHA has it entirely backwards. While most of the information in Forms 300 and 301 does not fall under any FOIA exemption, FOIA does *not* require the agency to disclose personal identifiable information and medical information that can be identified as applying to a specific person. *See Pub. Citizen*, 363 F. Supp. 3d at 15-17; 5 U.S.C. § 552(b)(6); *U.S. Dep't of State v. Wa. Post Co.*, 456 U.S. 595, 602 (1982). Therefore, it is significantly *more* likely that the benefits of public access to the detailed injury and illness data would be realized as a result of public disclosures than that the harms to worker privacy that OSHA claims to fear would occur. In any event, the real problem is that OSHA did not properly grapple with this issue at all. It considered public disclosure when it came to costs, but not when it came to benefits.

In a rulemaking that OSHA claims was based entirely on weighing risks to worker privacy and demands on OSHA's resources against the benefits of collecting this data, 84 Fed. Reg. at 387, OSHA cannot logically consider only the costs and possible harms of disclosure of the data while ignoring the benefits of the exact same disclosure.

## II. OSHA'S REASONING REGARDING THE COSTS OF COLLECTING THE FORM 300 AND 301 DATA IS FLAWED.

### A. OSHA Failed To Provide An Adequate Justification To Support Its Position That Worker Privacy Is Significantly Threatened By The Collection Of Data From Forms 300 and 301.

OSHA claims the primary reason for the Rollback Rule is "[t]o protect worker privacy," 84 Fed. Reg. at 380, and the agency repeatedly cites the "risk to worker privacy" as one of the key costs of collecting the data from Forms 300 and 301 that outweigh the benefits of doing so, *id.* at 381, 383, 388, 390, 397, 402. However, OSHA carefully considered this issue when it promulgated the Electronic Reporting Rule in 2016, and identified numerous actions it would take to ensure that sensitive and personally identifiable data would not be revealed.

16

As an initial matter, OSHA decided not to collect data from certain fields in Forms 300 and 301 (including names and addresses of employees, treating physicians, and medical facilities) because it determined that collecting such data would create a risk of release of sensitive information without helping users identify workplace hazards. 81 Fed. Reg. at 29,660-61. And in response to concerns that employers would accidentally include personally identifiable information in their descriptions of accidents and illnesses, OSHA noted that it could reduce the likelihood of errors by including instructions to employers not to include such personal or confidential information. *Id.* at 29,659. In addition to taking these upfront steps to reduce the chance of receiving personally identifiable and sensitive information, OSHA planned to review all data received using software to remove personally identifiable information, *id.* at 29,662, and to conduct a special review of all incidents considered "privacy concern cases" under its regulations, *id.* at 29,663. To minimize the risk of a release of sensitive information in a cyber attack, OSHA also planned to segregate and encrypt all unreviewed data behind a secure firewall with limited access. *Id.* at 29,662.

In the 2019 Rollback Rule, OSHA cites no new evidence of threats to worker privacy to support its abrupt change of position and fails to explain why it now considers the threats to worker privacy so much more serious.[7] OSHA's assertion that the new rule is needed to protect worker

---

[7] In fact, although OSHA states that "private citizens and health advocacy organizations expressed concern about the sensitive nature of the data," 84 Fed. Reg. at 385, only five of the 1774 private citizens who commented on the rule expressed any privacy concerns (and one of those opposed the collection of data that OSHA actually never planned to collect). *See* 2019-AR01936; 2019-AR01938; 2019-AR01975; 2019-AR01979; 2019-AR02030. And while the public health organization that OSHA cited for this proposition did acknowledge that the forms could contain sensitive information, it nonetheless strongly supported OSHA's collection of the information and opposed the Rollback Rule. *See* 2019-AR01034-35. Moreover, *none* of the workers' advocacy groups that submitted comments expressed concerns that collecting or publishing the detailed data under the framework laid out in the Electronic Reporting Rule would pose a risk to worker privacy. *See, e.g.*, 2019-AR00440; 2019-AR09451; 2019-AR00804; 2019-AR00974; 2019-AR00981;

privacy is therefore arbitrary and capricious because it is contrary to the evidence before the agency and not supported by sufficient reasoning. *State Farm*, 463 U.S. at 43; *see also Fox Television*, 556 U.S. at 515 (noting that agency must "show that there are good reasons for the new policy" and provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when the "new policy rests upon factual findings that contradict those which underlay its prior policy"); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) ("An agency's departure from past practice can . . . if unexplained, render regulations arbitrary and capricious."); *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking and cannot survive review under the arbitrary and capricious standard."). Moreover, OSHA's consideration of the costs and benefits of collecting the detailed data is seriously flawed because OSHA fails to provide a sound justification for its assertion that collection of the detailed data under the conditions outlined in the Electronic Reporting Rule would have posed a significant risk to worker privacy.

**B. OSHA Based Its Assumed Costs On An Unreasonably High Standard Unsupported By The Record.**

In discussing its concerns with worker privacy and its estimate of the resources that would be required to fully redact submitted data, OSHA repeatedly states that it cannot "guarantee" that no personally identifiable information would be released or that a software review of the submitted

---

2019-AR00986; 2019-AR00992; 2019-AR01007; 2019-AR01057; 2019-AR01214; 2019-AR01317; 2019-AR01354; 2019-AR01369; 2019-AR01441; 2019-AR01484; 2019-AR01487; 2019-AR01507; 2019-AR01512; 2019-AR01524; 2019-AR01543; 2019-AR01552; 2019-AR01631; 2019-AR01647; 2019-AR01650; 2019-AR01668; 2019-AR01682; 2019-AR01695; 2019-AR01698; 2019-AR01706; 2019-AR01713; 2019-AR01726; 2019-AR01731; 2019-AR01754; 2019-AR01766; 2019-AR01849; 2019-AR01922; 2019-AR02450; 2019-AR02522.

would catch 100 percent of personally identifiable information. *See, e.g.*, 84 Fed. Reg. at 384, 385, 386, 388, 400. As the scholarly literature on de-identification that OSHA itself cites in its rulemaking reflects, this is an unreasonable and unrealistic standard for any entity to set.

First, there is an inherent tension when de-identifying data between shielding the privacy of the subjects and providing usable information for research or other purposes, *see* 2019-AR00033-34, and laws and regulations generally aim to balance these goals rather than provide 100 percent privacy guarantees, *see* 2019-AR00035 ("US privacy policy reflected in laws and regulations is generally concerned with identity disclosure but not with other harms or problems that can result from the use or distribution of de-identified data."). For example, regulations addressing the privacy of patients' medical data under the Health Insurance Portability and Accountability Act ("HIPAA") allow two methods of de-identification, but "[n]either method promises a foolproof method of de-identification with zero risk of re-identification. Rather the methods are intended to be practical approaches to allow de-identified healthcare information to be created and shared with a low risk of re-identification." 2019-AR00044. OSHA provides no explanation for why it concluded that it should not collect workplace injury data unless it could be assured of the wholly unrealistic requirement of a 100 percent error-free process for disclosing requested data, rather than the more pragmatic approach of primarily using computer scrubbing that it embraced when it adopted the Electronic Reporting Rule. *See* 81 Fed. Reg. at 29,662.

In addition, despite OSHA's claim that it would need to have two reviewers manually review each submission to ensure adequate privacy protections, *see* 84 Fed. Reg. at 400, the articles OSHA itself cites support the use of computerized de-identification programs, which they describe as having an accuracy comparable to human review:

> Automatic text de-identification tools can de-identify clinical text with high accuracy comparable to the performance of human annotators. Furthermore, automatic de-identification is fast and inexpensive.

19

> Unlike human annotators, computers do not get tired but instead, consistently produce the same level of quality for every document as long as these documents do not differ from each other in style and context.

2019-AR00079; *see also* 2019-AR00070 (explaining that software-based natural language processing methods "have been shown to allow for high accuracy" and that the problems they have "are also shared with manual de-identification approaches"). In addition, text de-identification systems "tend to favor sensitivity (for identifiers) over specificity, and may inadvertently remove non-identifying health information in the process"—in other words, rather than leaving in too much identifying information, automatic systems are more likely to be overly protective, removing *more* data than necessary. 2019-AR00081; *see also* 2019-AR00070 (explaining that natural language processing systems may accidentally categorize non-sensitive information as sensitive). Finally, the articles suggest a combination approach to de-identification, whereby data de-identified through an automated process can be manually audited to ensure that satisfactory results are achieved, *see* 2019-AR00031, a possibility OSHA never acknowledged or explored.

In short, neither OSHA's embrace of a standard of 100 percent perfect de-identification of all personally identifiable information, nor its conclusion that manual review of all the data submitted is the best way to protect privacy, are supported by the evidence in the record.

### C. OSHA Failed To Provide Adequate Notice Of Its New Assessment Of The Costs Of Review And Redaction.

An agency is required to provide "adequate notice and opportunity for comment" before promulgating a new rule. *Allina Health Servs. v. Sebelius*, 746 F.3d. 1102, 1110-11 (D.C. Cir. 2014); *see also* 5 U.S.C. § 553(b), (c) (establishing notice and comment requirements). While the agency may make changes between the proposed rule and the final rule, the final rule must be "a 'logical outgrowth' of the proposed rule" such that interested parties could have "anticipated the change" and "reasonably should have filed their comments on the subject during the notice-and-

20

comment period." *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 86 (D.D.C. 2012), (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005)), *aff'd in part & rev. in part on other grounds*, 746 F.3d 1102.

Here, in its Notice of Proposed Rulemaking, OSHA estimated that the Rollback Rule would save the federal government approximately $53,000 to $64,000 per year by eliminating the collection of data from Forms 300 and 301. 83 Fed. Reg. at 36,503. However, in the Final Rule, OSHA radically changed its estimate, adding an additional $7.5 million in annual government savings. 84 Fed. Reg. at 402. This dramatic increase in OSHA's estimate of the costs of collecting the data is based on its determination that all data submitted would need to be manually reviewed by two OSHA reviewers. *Id.* at 400. This position is a substantial departure from OSHA's position in the Electronic Reporting Rule, where OSHA stated that, as part of its review, it would "use software that will search for and de-identify personally identifiable information" before posting it. 81 Fed. Reg. at 29,632. Although OSHA mentioned concerns with using software for de-identification purposes in the Notice of Proposed Rulemaking, *see* 83 Fed. Reg. at 36,498, it never mentioned the type of review that it believed would be needed, or any costs associated with such review, *see id.* at 36,501-03 (describing and listing cost savings).

By expressing this position and presenting these costs for the first time in the Final Rule, OSHA deprived the public of the opportunity to comment on and challenge OSHA's determination and the reasoning behind it, defeating the APA's requirement that the agency "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553(c). This about-face and more than ten-fold cost increase was not a "logical outgrowth" of OSHA's previously expressed positions such that the public could have reasonably anticipated or commented on it. *See Allina Health*, 904 F. Supp. 2d at 86 (noting need for interested parties to reasonably be able to comment

21

on change). Because OSHA's determination that the benefits of collecting the data "are outweighed by the cost of developing a system to manage that volume of data," 84 Fed. Reg. at 389, is central to its decision to implement the Rollback Rule, the agency's failure to provide the public with notice and an opportunity for comment on the agency's assessment of costs is a clear violation of the APA's requirements.

### III. OSHA'S REASONING REGARDING THE BENEFITS OF COLLECTING THE FORM 300 AND 301 DATA IS FLAWED.

#### A. OSHA Unreasonably Ignored or Dismissed Significant Record Evidence Of The Benefits Of The Detailed Data.

In the Rollback Rule, OSHA consistently discusses its balancing of the risks to worker privacy and the administrative burdens of collecting the data from Forms 300 and 301 against data's uncertain value for *its own* enforcement and compliance assistance efforts. *See, e.g.*, 84 Fed. Reg. at 381, 383, 387-93, 397-98, 402. However, as discussed in more detail below, the administrative record is replete with evidence that OSHA's collection of the data would have substantial value to numerous other entities, including states, workers and their advocates, and public health researchers. To the extent that OSHA discusses these benefits at all, it dismisses them for conclusory reasons. As a result, OSHA's analysis of the benefits of the Rollback Rule is deeply flawed, and its decision to abandon the Electronic Reporting Rule is arbitrary and capricious.

#### 1. Benefits of the Data to States.

In their comments on the Rollback Rule, the State Attorneys General informed OSHA that the detailed injury and illness data from Forms 300 and 301 would be "valuable to state agencies when carrying out enforcement work," and that state-level databases would not be an adequate substitute for a nationwide pool of information. 2019-AR01500-01. Specifically, the State Attorneys General highlighted the example of the New Jersey Department of Labor and Workforce Development, which planned to use the data "to better target its inspections and outreach

22

programs," and whose inspectors "planned to access the detailed establishment-specific data . . . in advance of onsite inspections so that they could tailor their inspections to the particular hazards and conditions previously reported at the facility." 2019-AR01500. This concern was echoed by other commenters, who noted that state agencies could use the data to "better target programmed inspections," 2019-AR01633, "improve surveillance of occupational injury and illness," 2019-AR01711, and "identify patterns that are currently masked by the aggregation of injury/illness data by industry in existing data sources," *id*. And OSHA itself previously recognized that access to this data would assist state "institutions charged with injury and illness surveillance" in better understanding emerging occupational hazards and in targeting their own programs. 81 Fed. Reg. at 29,631.

In the Rollback Rule, OSHA admits that it will share the data it collects with the states, 84 Fed. Reg. at 395, so it cannot rely on the rationale that the states would not have access to the data to ignore these likely benefits from the data collection. Nonetheless, OSHA blithely dismisses the benefits that would accrue to state programs without any serious consideration. For example, without providing any contrary data of its own and despite the State Attorneys General's uncontested knowledge of their own state agencies and programs, OSHA simply dismisses as "speculative" the comment by the State Attorneys General that the data would be helpful for states without state plans. *Id.* at 394. This assertion by OSHA is contrary to its own findings in the Electronic Reporting Rule, where it noted that the data would be "of great use to county, state, and territorial Departments of Health and other public institutions charged with injury and illness surveillance." 81 Fed. Reg. at 29,631. It is also contradicted by the Council of State and Territorial Epidemiologists, which informed OSHA that the detailed injury and illness information would enable state health agencies to identify emerging problems, develop prevention programs, and

23

incorporate occupational health issues into community health planning. 2019-AR01083. OSHA also suggests that states with state plans can choose to collect and share this data at the state level, *id.*, without grappling with the State Attorneys General's comment that a state-level dataset would be "less likely to reveal important workplace health and safety trends" than a nationwide one, 2019-AR01500-01; *see also* 2019-AR01023 (NIOSH describing difficulty of conducting surveillance and research using fragmented data sets held by multiple states and organizations).

In sum, OSHA failed to adequately consider the evidence in the record and comments received regarding the benefits of the Electronic Reporting Rule to the state agencies, and as a result, OSHA's weighing of the costs and benefits of collecting the data from Forms 300 and 301 is fundamentally flawed. *See Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 54-55 (D.D.C. 2019) (finding rulemaking arbitrary and capricious because agency failed to consider benefits of prior rule, including access to and comparability of data), *app. filed*, No. 19-5137 (May 10, 2019).

## 2. Benefits of the Data to Employees and Worker Advocates.

Similarly, in promulgating the Rollback Rule, OSHA also failed to consider the benefits that the detailed injury and illness data would have for workers, their representatives, and advocacy organizations despite significant evidence in the record before it. As OSHA explained in the Electronic Reporting Rule, public access to the data would "nudge" employers to voluntarily abate hazards, help employers benchmark their safety and health performance against comparable establishments, allow employees to compare their workplaces against others and better identify and help abate workplace hazards, and provide important information for job seekers (in turn incentivizing employers to make improvements). 81 Fed. Reg. at 29,629-32. OSHA cited multiple pieces of scholarship in support of these benefits. *See id.* at 29,629 & 29,647. In the comment period for the Rollback Rule, these and similar benefits were highlighted by many organizations

24

and individuals who opposed the proposed rule. *See, e.g.*, 2019-AR01007; 2019-AR01057; 2019-AR01317; 2019-AR01354; 2019-AR01369; 2019-AR01441; 2019-AR01487; 2019-AR01754; 2019-AR01766; 2019-AR02450; 2019-AR02522.

OSHA dismissed these benefits out-of-hand because it "has determined that publishing the data would do more harm than good." 84 Fed. Reg. at 391. However, as discussed in Section I, *supra*, OSHA's premise that there would be no public access to the data is unsupportable in light of the likelihood that interested individuals and entities could obtain access to much or all of the data via FOIA requests, as this Court suggested and as the agency itself acknowledges. OSHA thus entirely failed to provide an adequate response to the comments or consideration of the evidence before it on this issue, and, as a result, the agency's weighing of the overall costs and benefits of rolling back the requirements of the Electronic Reporting Rule is inescapably unsound.

### 3. Benefits of the Data to Researchers.

In the Electronic Reporting Rule, OSHA recognized that the data it planned to could enable researchers to "identify patterns of injuries and illnesses that are masked by the aggregation of data" and "conduct rigorous studies that will increase our understanding of injury causation, prevention, and consequences." 81 Fed. Reg. at 29,631; *see also id.* at 29,668 (noting that researchers could use the data to "identify hazards related to reportable events and identify industries and processes where these hazards are prevalent"). Numerous commenters on the Rollback Rule, including the National Institute for Occupational Health and Safety, also highlighted these benefits for OSHA. *See, e.g.*, 2019-AR00461; 2019-AR01017; 2019-AR01033; 2019-AR01087; 2019-AR01132; 2019-AR010655; 2019-AR01799.

In responding to comments from researchers, OSHA "acknowledge[d] that the 300 and 301 data would have benefits for occupational safety and health research." 84 Fed. Reg. at 391. However, OSHA dismissed these benefits by noting that "researchers already have access to

25

[Bureau of Labor Statistics ("BLS")] data and severe injury data." *Id.* In doing so, OSHA ignored multiple comments explaining that the BLS data has substantial limitations not present with the data OSHA planned to collect and make available under the Electronic Reporting Rule. For example, BLS data does not include injuries, such as most musculoskeletal disorders, that involve job transfers or restrictions rather than time away from work, 2019-AR01365, and does not include narrative descriptions of the circumstances and causes of injuries, which can help researchers develop ideas for preventative interventions, 2019-AR01023. Even OSHA itself had noted in 2016 that the detailed data underlying BLS statistics is only available to researchers "in a restricted way," while its own data would be available "with far fewer restrictions." 81 Fed. Reg. at 29,685. Again, OSHA's weighing of the costs and benefits of collecting the Form 300 and 301 data is fatally flawed because OSHA entirely failed to consider the significant benefits that the detailed data would have to public health researchers.

### B. OSHA Inconsistently Asserts That Making Any Data Public Would Harm Its Enforcement Efforts, While Simultaneously Insisting That It Does Not Plan to Use The Form 300 And 301 Data For Enforcement Purposes.

In the Rollback Rule, OSHA repeatedly asserts, as a justification for not collecting the Form 300 and 301 data, that any incremental benefit the data might have for its enforcement compliance assistance efforts is "uncertain." 84 Fed. Reg. at 381, 383, 387-93, 397-98, 402. And the agency makes clear that it is not prepared to "divert resources" away from other priorities to analyze and develop methods for effectively using this data. *See, e.g.*, *id.* at 389. However, OSHA also asserts, as a justification for discounting the benefits that the employees, advocates, and researchers could obtain from the data, that it would not make any data it collects public in order to protect the confidentiality of its enforcement efforts. *Id.* at 383, 391. If OSHA does not intend to use the information from Forms 300 and 301 in enforcement efforts, then the public's access to

that data simply cannot undermine OSHA's enforcement efforts. That is another internal inconsistency that proves fatal to OSHA's rulemaking.

## CONCLUSION

For any or all of the reasons above, this Court should grant the Plaintiff States' motion for summary judgment and hold unlawful and set aside OSHA's 2019 Rollback Rule.

Respectfully submitted,

DATED: June 7, 2019

GURBIR S. GREWAL
Attorney General of New Jersey
s/ *Glenn J. Moramarco*
GLENN J. MORAMARCO
(admitted 2/27/2019)
Assistant Attorney General
s/ *Elspeth L. Faiman Hans*
ELSPETH FAIMAN HANS
(admitted 1/24/2019)
Deputy Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3235
Glenn.Moramarco@law.njoag.gov
Elspeth.Hans@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

KWAME RAOUL
Attorney General of Illinois
HARPREET KHERA
Deputy Bureau Chief
ELIZABETH ROBERSON-YOUNG
Public Interest Counsel
s/ *Aaron Wenzloff*
AARON WENZLOFF
(admitted 3/5/2019)
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, IL 60601
(312) 814-3000
AWenzloff@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

BRIAN E. FROSH
Attorney General of Maryland
s/ *Leah J. Tulin*
LEAH J. TULIN
(admitted 7/22/2009, renewed 3/25/2019)
JEFFREY P. DUNLAP
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7906
ltulin@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

27

MAURA HEALY
Attorney General of Massachusetts
s/ *Amy L. Goyer*
AMY L. GOYER
(admitted 3/8/2019)
Assistant Attorney General
Massachusetts Attorney General's Office
105 William Street
New Bedford, MA 02740
(617) 963-2319
Amy.Goyer@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General of Minnesota
CHRISTIE B. ELLER
Deputy Attorney General of Minnesota
s/ *Jonathan D. Moler*
JONATHAN D. MOLER
(admitted 3/7/2019)
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
St. Paul, MN 55101-2127
(651) 757-1330
jonathan.moler@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

LETITIA JAMES
Attorney General of New York
s/ *Matthew Colangelo*
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
(D.C. Bar No. 997893)
MICHAEL HIGGINS
AMY SCHNEIDER
JULIE R. ULMET
Assistant Attorneys General
28 Liberty St., 15th Floor
New York, NY 10005
(212) 416-6305
Matthew.Colangelo@ag.ny.gov
*Attorneys for Plaintiff State of New York*

28