**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STATE OF NEW JERSEY; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MINNESOTA; and STATE OF NEW YORK,<br><br>             Plaintiffs,<br><br>      v.<br><br>PATRICK PIZZELLA,[1] *in his official capacity as Acting Secretary of the United States Department of Labor*; LOREN SWEATT, *in her official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health*; UNITED STATES DEPARTMENT OF LABOR; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION,<br><br>             Defendants. | **Civil Action No. 19-621-TJK** |

**STATE PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF STATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| **Gurbir S. Grewal**<br>Attorney General of New Jersey<br>New Jersey Attorney General's Office<br>Richard J. Hughes Justice Complex<br>25 Market Street<br>Trenton, NJ 08625 | Glenn J. Moramarco (D.D.C. Admission 2/27/2019)<br>Assistant Attorney General<br>Eric L. Apar (D.D.C. Admission 2/26/2019)<br>Elspeth F. Hans (D.D.C. Admission 1/24/2019)<br>Deputy Attorneys General<br>Glenn.Moramarco@law.njoag.gov<br>Eric.Apar@law.njoag.gov<br>Elspeth.Hans@law.njoag.gov<br>(609) 376-3232<br>*Attorneys for State of New Jersey*<br>*(additional counsel for plaintiffs listed on signature page)* |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Patrick Pizzella, Acting Secretary of the United States Department of Labor, is automatically substituted as a defendant for R. Alexander Acosta, former Secretary of the United States Department of Labor.

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................................1

ARGUMENT

    I.     THE ROLLBACK RULE IS SUBSTANTIVELY ARBITRARY AND
         CAPRICIOUS.................................................................................................3

         A.  The Rollback Rule's Cost-Benefit Analysis Is Internally Inconsistent .............3

         B.  OSHA's Demand For A "Guarantee" Of Absolute Privacy Imposed An
             Unreasonably High Standard That Skewed Its Cost-Benefit Analysis..............9

         C.  OSHA's Dismissal Of The Well-Documented Benefits From Collecting
             The More Extensive Worker Injury And Illness Data Is Arbitrary and
             Capricious ...............................................................................................11

    II.    THE ROLLBACK RULE IS PROCEDURALLY UNLAWFUL.........................15

CONCLUSION...................................................................................................................18

## TABLE OF AUTHORITIES

### CASES

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014)................................15

*Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75 (D.D.C. 2012) ............................15

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009)..................17

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250 (D.C. Cir. 2005) ......................................................................................................................15

*Michigan v. EPA*, 135 S.Ct. 2699 (2015) .......................................................................7

*Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n (NRDC)*, 879 F.3d 1202 (D.C. Cir. 2018) ............................................................................................................1, 3

*Pennsylvania v. Trump*, __ F.3d __, No. 17-3752, 2019 WL 3057657 (3d Cir. July 12, 2019)  ....4

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) ......................................4

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir. 1983) .................17

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)  ..............................................................................................................6

### STATUTES

5 U.S.C. § 553.....................................................................................................................15

### REGULATIONS

Improve Tracking of Workplace Injuries and Illnesses, 81 Fed. Reg. 29,624 (May 12, 2016) ......6

Tracking of Workplace Injuries & Illnesses, 83 Fed. Reg. 36,494 (July 30, 2018) ................16, 17

Tracking of Workplace Injuries & Illnesses, 84 Fed. Reg. 380 (Jan. 25, 2019) ...7, 8, 9, 11, 14, 16

**INTRODUCTION**

Defendants misunderstand what this case is about. Defendants suggest that this case turns on "a difference of opinion as to how OSHA weighed the evidence before it and the priority OSHA placed on different policy-making considerations." Br. 19. But this case is not about policymaking; Plaintiff States agree that OSHA has the statutory authority to set its policies. Defendants spill ink arguing, as well, that the relevant statutory provisions do not require collection of Forms 300 and 301, and OSHA was "permitted to reflect, reconsider, and reach a different policy judgment" from its decision in 2016 to collect these forms. Br. 2. Again, however, that is nonresponsive; Plaintiffs nowhere argue that the OSH Act required OSHA to collect Forms 300 and 301 or barred OSHA from changing its mind. Plaintiff States have not even argued, contrary to Defendants' suggestion, that OSHA had to comply with any sort of "heightened standard" to justify its "change in policy." Br. 20. Much of Defendants' brief, then, is irrelevant to the disposition of Plaintiff States' claims. Plaintiff States' case is about one thing: whether OSHA sufficiently justified its 2019 Rollback Rule, an APA-based obligation that it must satisfy for any rulemaking—change in policy or not.

And that, as Plaintiff States explained, is where OSHA falls short. Most importantly, when an agency seeks to satisfy the APA's demand of a reasoned explanation for every rulemaking, that agency cannot offer an explanation that is "internally inconsistent." *Nat. Res. Def. Council v. U.S. Nuclear Regulatory Comm'n (NRDC)*, 879 F.3d 1202, 1215 (D.C. Cir. 2018). That makes sense, of course; an inconsistent decision is almost by definition an arbitrary one, and it raises questions as to whether the agency engaged in a good-faith analysis of the issue or simply sought to justify a predetermined result. That is especially true when an agency chooses to conduct a cost-benefit analysis. The idea of a cost-benefit analysis is to establish that federal officials properly calculated the impacts of a rule—both those that support the final decision and those that do not—and found

that the benefits make the costs worth bearing. Were an agency able to treat costs and benefits in an inconsistent manner, perhaps by considering the downsides of certain outcomes while declining to consider their silver linings, agencies could justify anything—from a sweeping environmental restriction to new regulations on the financial sector. That is not the law.

That is where OSHA went astray. As Plaintiff States noted in their Opening Brief, internal inconsistencies plague the cost-benefit analysis that justified the Rollback Rule. Most prominently, OSHA failed to maintain a consistent set of assumptions in calculating the costs and benefits of its decision. In estimating costs, OSHA highlighted the harms to worker privacy that would occur if detailed forms were to be publicly disclosed. Yet OSHA refused to consider the health and safety benefits that would result from that same public disclosure on the basis that OSHA decided not to permit such public disclosure. The problem is apparent: either OSHA thinks that public disclosure of detailed data will happen and has to consider its costs *and* benefits, or OSHA concludes that such disclosure is not going to occur and thus cannot consider either the costs *or* the benefits. What OSHA cannot do is mix and match those assumptions to skew the cost-benefit analysis to inflate the benefits of its rule and understate the associated costs. And nothing Defendants offer in their brief can ultimately cure this central inconsistency.

Nor was this inconsistency OSHA's only failure of reasoning under the APA. In addition, the agency improperly demanded a "guarantee" that collection of the data would not result in the release of personally identifiable information—an impossible standard that tilted the scales in favor of OSHA's preferred outcome. Likewise, OSHA dismissed the myriad benefits of collecting such data as "speculative," despite ample record evidence that the benefits are real and substantial. Moreover, the process that OSHA followed in issuing the Rollback Rule was unlawful because

the agency failed to give adequate notice of its decision to require a two-tiered manual review of this data, and its view of the 100-fold increase in projected costs that would come with it.

## ARGUMENT

## I.   THE ROLLBACK RULE IS SUBSTANTIVELY ARBITRARY AND CAPRICIOUS.

OSHA's Rollback Rule is substantively arbitrary and capricious for the reasons set forth in the Plaintiff States' Opening Brief. For the purposes of responding to Defendants' Brief, three of those reasons warrant special attention here. First, the agency failed to maintain consistent assumptions when calculating the costs and benefits of the Rollback Rule. Second, the agency created an unreasonably high burden for preventing the release of certain information. And third, the agency mistakenly thought that the benefits of collecting the information at issue were "speculative" despite contrary record evidence.

### A.  The Rollback Rule's Cost-Benefit Analysis Is Internally Inconsistent.

While an agency doubtless is free to change policy positions, it must do so in a manner that weighs the costs and benefits of any change in a fair, logical, and consistent manner—just as it had to do for the original rule itself. As the D.C. Circuit has held, "it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" *NRDC*, 879 F.3d at 1215. That test proves fatal to OSHA's Rollback Rule. As Plaintiff States have explained, the agency failed to maintain consistent assumptions when calculating the costs and benefits of the Rollback Rule. OSHA decided to consider the costs to worker privacy that would occur if the detailed injury data were to be publicly disclosed, but refused to consider any benefits to worker health and safety that would result from that same public disclosure. OSHA cannot have it both ways.

Defendants' first two responses to this argument miss the point entirely. First, Defendants say, "OSHA did not need to consider the benefits of *publishing* the data when it promulgated the

Revised Rule." Br. 33 (emphasis in original). After all, "having already made the decision not to publish the data, OSHA was under no obligation to consider the benefits of publication in promulgating the Revised Rule." *Id.*[2] Second, Defendants add, "the prospect that the 300 and 301 data could eventually be released under FOIA does not change the calculus." Br. 34. Defendants justify that statement on the basis that there is "no authority suggesting that agencies must factor in those alleged benefits—*i.e.,* the benefit of information possibly being released in response to a FOIA request—when the agencies decide whether to collect information in the first place." *Id.* But those arguments are nonresponsive to the APA issue raised here. Plaintiff States' lead argument has nothing to do with whether, in the abstract, OSHA must consider the benefits of publishing data if the agency decides not to do so. Similarly, this argument does not turn on whether OSHA always needs to consider the benefits of a FOIA-mandated disclosure, or whether FOIA can actually "obligate agencies to create or retain documents." *Id.* Instead, Plaintiff States' point is simpler: *if* OSHA decides that disclosure is likely enough that OSHA must factor in the costs of such disclosure, *then* OSHA also has to evaluate the benefits of that same disclosure to comply with the APA's guarantee of reasoned and consistent analysis. The argument can be summed up in a common refrain: what is good for the goose is good for the gander. And it is exactly what *NRDC* requires. As a result, Defendants' first two arguments in Part II(B)(2) cannot salvage the central problem of internal inconsistency.

---

[2] This admission is striking. As OSHA itself acknowledges, it had decided not to publish detailed data even before it issued the notice of proposed rulemaking for the Rollback Rule. *Id.* In its own words, then, OSHA lacked an "open mind" during this rulemaking. *See Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) (stating that an "agency must also remain sufficiently open-minded" to satisfy APA's notice and comment requirements); *Pennsylvania v. Trump*, __ F.3d __, No. 17-3752, 2019 WL 3057657, at *12 (3d Cir. July 12, 2019), *as amended* (July 18, 2019) (noting "the opportunity for comment must be a meaningful opportunity to have interested parties share their views, and to have the agency consider them with an 'open mind'").

4

The continued inconsistency is made even more apparent by Defendants' brief. Just pages before Defendants argue *against* requiring the agency to "factor in … the benefit of information possibly being released in response to a FOIA request," Br. 34, Defendants argue that OSHA *did* still have to consider and account for the costs of public disclosure because of the "risk of court-ordered disclosure under FOIA—a result that OSHA disagreed with, but reasonably anticipated." Br. 26. In Defendants' own words, OSHA's position on costs reflects a proper "assessment of the risks to worker privacy: If disclosing data from Forms 300 and 301 would mean releasing sensitive worker information, then OSHA was right to be concerned about the consequences of a court ordering release of that information under FOIA." Br. 26. OSHA's reasoning is at war with itself. After all, if Defendants are right—"[i]f disclosing data from Forms 300 and 301 would mean releasing sensitive worker information"—how can OSHA get away with ignoring the beneficial "consequences of a court ordering release of that information under FOIA"? That inconsistency undermines the idea that OSHA conducted a fair and reasoned analysis of its chosen path.

To their credit, Defendants do offer one argument that responds to Plaintiff States' charge that OSHA treated these costs and benefits inconsistently. But the argument is neither legally nor factually sufficient. Defendants' argument goes like this: OSHA was perfectly free to consider the costs but not the benefits of such a court-ordered disclosure because "the costs of having to scrub the records for sensitive information fall directly within the agency's purview," whereas "[w]hat happens to the information after a FOIA request, by contrast—*i.e.,* whether the information is held onto by the requester, shared with a select group of researchers, or published far and wide—is outside the agency's purview and control." Br. 34-35.

There is no basis in law or logic for this "agency-purview distinction"—and Defendants do not provide one. Indeed, the Electronic Reporting Rule cited in great detail the myriad benefits

5

that would flow from the public dissemination of detailed health and safety data. *See, e.g.,* 81 Fed. Reg. at 29,647-48; 2016-AR03219-24 (comment from epidemiologists explaining that publication "would substantially enhance occupational health surveillance capacity in the United States," with "the potential to facilitate timely identification of emerging hazards … which is increasingly providing the basis for setting community health and prevention priorities); 2016-AR03896-3904 (comment from workers' advocacy group noting that "electronic posting by OSHA of information related to fatality and injury and illness incidents would allow individuals who may be considering employment to assess the types, severity, and frequency of injuries and illnesses of a particular firm or workplace"). It is one thing to contend that OSHA is not *required* to disseminate data. But it is another thing altogether to contend that, in deciding what information to collect and disclose, the agency was not required *even to consider* benefits that would flow from the public disclosure of that data—"an important aspect" of this decision. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

A holding that adopts Defendants' "agency-purview distinction" would be unprecedented and would have ramifications well beyond this litigation. Agencies, of course, routinely consider costs and benefits based on third-party actions. Any federal law or regulation that has a disclosure requirement—from Food and Drug Administration labeling regulations to National Environmental Policy Act evaluations—relies completely on the idea that cognizable benefits exist to giving third parties information, even if the way information is shared and used will ultimately lie "outside the agency's purview and control." Under Defendants' proposed cost-benefit analysis, however, it is hard to see how any agency could justify such a rule: the agency would have to consider all of the internal costs of collecting and publishing the information, but could not consider any of the third-party benefits of receiving such information. The same holds true for compliance costs: EPA, for

6

example, often considers the costs that regulated parties will have to bear when issuing rules. These are costs that, in Defendants' words, fall "outside the agency's purview and control"—but are still part and parcel of rulemaking. *See Michigan v. EPA*, 135 S.Ct. 2699, 2708 (2015) (reversing an EPA rulemaking because the agency refused to consider the "cost" to "power plants" of complying with limits on emissions of hazardous air pollutants). Defendants' "agency-purview distinction" suggests that benefits of information-sharing regimes, and even compliance costs of regulations, might never properly be considered in a cost-benefit analysis.

Defendants' "agency-purview distinction" does not even hold up on the facts of this case. Defendants suggest that the costs OSHA needed to worry about were entirely internal and did not depend at all on third-party actions. But the only reason OSHA would have to "scrub the records for sensitive information" is *because* of perceived third-party actions. After all, the Rollback Rule relies heavily on the fact that while employers omit personally identifiable information from their submissions, "in many circumstances it may be possible to combine data points to identify specific workers who reported injuries or illnesses along with personal details about their conditions." 84 Fed. Reg. at 384; Def. Br. 22. Defendants further speculate that "[t]he result of that re-identification could be the public exposure of sensitive information about workers." Br. 22. But these actions, as much as the claimed benefits, turn on "[w]hat happens to the information after a FOIA request" and on actions by third-parties that fall "outside the agency's purview and control." In other words, the costs OSHA has to bear are not "purely" internal, but are themselves a response to what some third parties might do with this information. And so OSHA is continuing to act in an inconsistent manner—considering, as part of its rulemaking, the costs of what certain third parties would do with the Form 300 and Form 301 data, while refusing, as part of the same rulemaking, to look at the benefits of what other third parties would do with it. Thus, whatever the merits of Defendants'

7

"agency-purview distinction"—and again, Plaintiff States reject any such distinction—it cannot resolve this rule's fundamental inconsistency.

As a fallback argument, Defendants assert that "assuming *arguendo* that the agency was required to consider the benefits of publication, OSHA did so." Br. 35. But the record as a whole refutes that claim. Defendants rely on a single sentence in the Rollback Rule that lists many of the benefits noted in the Electronic Reporting Rule that would result from disclosing the data, but then simply dismisses all of those benefits by asserting that they were never quantified and "the scope of any such benefits is uncertain." 84 Fed. Reg. 393. However, part of OSHA's uncertainty about the scope of the benefits stemmed from its underlying assumption that the data might not be publicly disclosed. That reintroduces OSHA's faulty reasoning of failing to maintain consistent assumptions when balancing the costs and benefits from the likelihood of disclosure, and it therefore cannot function as a true alternative ground for affirmance. Indeed, the Rollback Rule elsewhere made it clear that OSHA assigned no possible value to public release of the data because "OSHA would not make the data public even if collected." 84 Fed. Reg. 391; *see id.* ("Without publication, the research benefits claimed by many commenters . . . also fall away"); *id.* (stating that "many of the benefits discussed by commenters would not materialize … "[b]ecause OSHA has determined publishing the data would do more harm than good"). In any event, while OSHA clearly was not relying on a single conclusory sentence about uncertain benefits as an alternative holding, that sentence itself is incorrect and unreasoned. As explained in Point I(C), below, commenters to the Proposed Rollback Rule pointed to myriad potential benefits from disclosure—benefits that OSHA failed to consider. The Agency's failure to consider the benefits that would arise from public disclosure of the detailed forms, while fully taking into account the harms to

8

worker privacy that would occur if detailed forms were to be publicly disclosed, was logically inconsistent, resulting in arbitrary and capricious decision-making.

### B. OSHA's Demand For A "Guarantee" Of Absolute Privacy Imposed An Unreasonably High Standard That Skewed Its Cost-Benefit Analysis.

In their Opening Brief, Plaintiff States demonstrated that, in conducting its cost-benefit analysis, OSHA set an improperly high standard requiring it to "guarantee" that no employee's personally identifiable information would be disclosed, inadvertently or otherwise. *See* States' Brief at 18-20; *see also* 84 Fed. Reg. at 384, 385, 386, 388, 400. Data collection involving individual subjects inherently entails some risk of disclosure of personally identifiable information, and private and public entities typically seek to maximize the collection of useful data while minimizing, but not wholly eliminating, the risk of disclosing sensitive information. As previously noted, the Electronic Reporting Rule went to great lengths to safeguard worker privacy. The Rollback Rule, however, set an impossible standard that skewed the cost-benefit analysis in an arbitrary and capricious manner.

Defendants' Brief does not attempt to defend their unreasonable standard. Instead, it simply recapitulates the findings of the Rollback Rule and claims that "Plaintiffs do not meaningfully contest OSHA's key determinations on this point." Br. 26-27. In particular, Defendants assert that Plaintiffs do not dispute the Rollback Rule's findings that employers occasionally inadvertently disclose personally identifiable information, that de-identification software is "imperfect," and that de-identification software does not eliminate the possibility of re-identification. Br. 27.

Defendants' arguments simply miss the point. Plaintiff States do not dispute the mere *possibility* of inadvertent disclosure, imperfections in the de-identification software, or re-identification. Rather, they contend that a privacy standard that insists on eliminating even the slightest chance of identification is both unreasonable and contrary to privacy law. Rather than

9

attempting to defend their unprecedented standard, Defendants simply reaffirm it without justification and insist, unsurprisingly, that the Electronic Reporting Rule falls short of achieving perfection. *See* Br. 26-28. Defendants' failure to address directly Plaintiff States' actual argument is not surprising, as the Rollback Rule's absolutist privacy standard is unprecedented and indefensible. Indeed, were Defendants' absolutist standard to prevail more broadly, it would needlessly handicap agencies in their pursuit of empirical rigor and scientific understanding.

Also, Defendants claim that Plaintiff States "ignore OSHA's explanation as to *why* manual review would be necessary" to guarantee privacy, Br. 27-28 (emphasis in original), but that contention is mistaken. In addition to challenging the Rollback Rule's unreasonable absolutist privacy standard, Plaintiff States' Opening Brief highlighted the record evidence of the accuracy and reliability of de-identification software. States' Brief at 18-20. In particular, Plaintiff States' Opening Brief cited record evidence that de-identification software is at least as effective as manual review—and may even be more so in light of manual reviewers' susceptibility to fatigue. *Id.* at 19-20. Plaintiff States also pointed to record evidence that de-identification software is likely to be *over*-protective of sensitive information, removing more data than is necessary. *Id.* at 20. This record evidence speaks directly to "OSHA's explanation as to *why* manual review would be necessary" to guarantee privacy. *Id.* at 27-28 (emphasis in original). Thus, Defendants' claim that Plaintiff States "ignore[d]" that explanation is simply wrong.

Finally, Defendants' contention that the Plaintiff States merely disagree with their weighing of the costs and benefits likewise is mistaken. The Plaintiff States disagree with the methodology and standards that underpinned OSHA's cost-benefit analysis and led to skewed results. OSHA dismissed as "speculative" the well-documented benefits cited by the many commenters who supported the Electronic Reporting Rule and opposed the Rollback Rule. *See* 84

10

Fed. Reg. at 393-94. At the same time, OSHA did not hold the costs of data collection—specifically, the risk to privacy—to the same high standard. OSHA treated the mere possibility that some employers might inadvertently misreport employee data, or that interested parties, after a FOIA request, might be able to re-identify an employee, as non-speculative harms that had to be prevented with 100 percent accuracy. This internal inconsistency—demanding certainty for benefits, but accepting speculation for possible harms—resulted in an arbitrary and capricious cost-benefit analysis.

**C. OSHA's Dismissal Of The Well-Documented Benefits From Collecting The More Extensive Worker Injury And Illness Data Is Arbitrary And Capricious.**

Defendants lean heavily on the notion that the benefits to third parties of the detailed data are "speculative." As noted in Part I(A), OSHA's conclusory line about the uncertain benefits arising from public disclosure of the detailed data cannot function as an alternative ground for its cost-benefit analysis. Moreover, OSHA is wrong, and its mere invocation of the word "speculative" is not a magic incantation that makes all contrary record evidence disappear. The benefits of collecting the data in Forms 300 and 301 were well-documented when OSHA adopted the Electronic Reporting Rule in 2016, and they were corroborated by the comments submitted in opposition to the Rollback Rule. OSHA has cited no changed circumstances and no changed facts between 2016 and now, only a change of mind. OSHA's rote dismissal of the well-documented benefits of collecting the additional worker illness and injury data reflects the absence of a fair and open-minded weighing of the evidence before it, resulting in an arbitrary and capricious determination.

In response to the proposed Rollback Rule, a broad spectrum of interested parties submitted comments explaining the utility of the data for their efforts to promote worker safety and health. Their comments reflected the benefits of the data across a myriad of industries and institutions.

Labor unions registered their strong opposition to the Rollback Rule. North America's Building Trades Unions ("NABTU"), for instance, emphasized the various benefits of the data for workers in the construction industry. 2019-AR01057-68. NABTU noted that access to the data would empower researchers "to validate what they have identified as 'leading indicators' of a good safety culture, which are in turn known by industry leaders to contribute to lower injury/illness rates, higher productivity/quality and betters places to work." 2019-AR01064. "This last point[,]" NABTU continued, "is particularly relevant, as … the ability to attract and retain the best workers is of paramount importance[.]" *Id.* The United Food and Commercial Workers International Union explained that the data would help it "identify areas to inspect and areas to implement controls to prevent injuries and illnesses"; "determine where training is needed, and what training needs to be made more effective"; and "identify trends among and between companies, and at specific sites within one company." 2019-AR01360. The United Steel, Paper and Forestry, Manufacturing, Energy, Allied Industrial and Service Workers International Union commented that the data would improve its capacity to mitigate hazards across a wide variety of industries, including "noise hazards in steel mills, hazards contributing to musculoskeletal injuries in tire plants, machine guarding concerns in paper facilities, temperature extreme hazards in aluminum facilities, and upper extremity repetitive strain injuries among hospital ultrasound technicians." 2019-AR02453.

Research institutions and workers' advocacy groups also expressed their strong opposition to the Rollback Rule. For example, Change to Win, an organization dedicated to advancing workers' rights, pointed to the benefits of the data for the hotel industry, where researchers have used their limited access to detailed data to generate "landmark findings on issues of race and gender discrimination that have been widely understood for generations as central questions in the creation of workplace hazards." 2019-AR01217. Change to Win further highlighted the benefits

12

of the data for the automobile industry, where one car manufacturer's searchable injury and illness database has allowed safety and health personnel to detect "early warning signs of potentially fatal injury events." 2019-AR01218-19 (internal quotation marks omitted). The Nebraska Appleseed Center for Law in the Public Interest stressed the benefits of the data for "address[ing] the costly, often permanently disabling, and unacceptably high rates of injuries in meat and poultry processing and other workplaces." 2019-AR01319. The UCLA Labor Occupational Safety and Health Program commented that the data would "fill a huge gap in our understanding and ability to effectively target the large number of preventable injuries and illness that disable workers nationwide." 2019-AR01801. Worksafe, a California-based organization committed to promoting workplace safety and health, observed that even limited access to detailed data "has been vital to workers and advocates to push for workplace improvements[,]" citing multiple examples of workers using the data to vindicate their rights and force employers to address safety and health hazards. 2019-AR01855-56.

In addition, states emphasized the benefits of the data in Forms 300 and 301 for their enforcement and compliance efforts. A coalition of State Attorneys General—several of whom are parties to this lawsuit—noted that the data would empower states "to better target [their] inspections and outreach programs." 2019-AR01500. In addition, the State Attorneys General stressed that state-level databases would be less likely than a national database "to reveal important workplace health and safety trends." *Id.* Washington State's Safety and Health Assessment and Research for Prevention program commented that the detailed data in Forms 300 and 301 would be "invaluable for prevention of workplace injury and illnesses[,]" and that "[s]ummary level data, such as that on the OSHA Form 300A, are inadequate to identify primary causes of injury and focus prevention resources." 2019-AR00994-96.

13

In contrast with these well-documented benefits from the expanded data collection, the purported harms resulting from collection of the additional data are contingent upon multiple hypothesized failures of the privacy protocols set forth in the Electronic Reporting Rule. First, the Rollback Rule maintains that "despite instructions not to include such information, some employers would submit [personally identifiable information] inadvertently in Forms 300 and 301[.]" 84 Fed. Reg. at 384; Def. Br. 22. Even then, however, the privacy risk would be contingent upon a failure of the Electronic Reporting Rule's encryption protocol and de-identification software, which Defendants describe as "'imperfect' at catching … [personally identifiable information]"—again, an unreasonably high standard. Br. 27.

The Rollback Rule then speculates that, even if employers omit personally identifiable information from their submissions and the encryption and de-identification process function as intended, "in many circumstances it *may be possible* to combine data points to identify specific workers who reported injuries or illnesses along with personal details about their conditions." 84 Fed. Reg. at 384 (emphasis added); Br. 22. Defendants further speculate that "[t]he result of that re-identification *could be* the public exposure of sensitive information about workers[.]" Br. 22 (emphasis added). Finally, since OSHA does not intend to make the data public, FOIA disclosure depends on the actions of third parties—a fact that, on the benefits side of the ledger, was enough to persuade Defendants that the benefits of FOIA disclosure were merely speculative. *Id.* at 34-35.

To be sure, there are bound to be errors and oversights in handling data at the margins. Indeed, it was precisely to minimize the risk of inadvertent disclosure and re-identification that the Electronic Reporting Rule took the sensible precautions explained above. But the privacy risks that OSHA relies upon certainly are no less "speculative" than the benefits of collection, and the mere possibility—however remote—of disclosure or re-identification cannot be dispositive to

14

OSHA's analysis. By declaring all of the asserted benefits from the Electronic Reporting Rule to be merely "speculative," while insisting that no sensitive employee data be inadvertently revealed, OSHA imposed an unworkable standard. In effect, OSHA demands a guarantee that there will be benefits, paired with a guarantee that there will *not* be costs. No rule could pass this rigged test. Such uneven treatment of costs and benefits is antithetical to the APA's requirement of reasoned decision-making. While the APA affords agencies discretion when weighing the costs and benefits of agency action, it does not permit the application of wildly divergent standards of proof on different sides of the cost-benefit ledger. OSHA's decision to dismiss all benefits from the collection of the additional data required under the Electronic Reporting Rule as "merely speculative" is a prototypical example of arbitrary and capricious reasoning.

## II.   THE ROLLBACK RULE IS PROCEDURALLY UNLAWFUL.

As Plaintiffs States noted in their Opening Brief, the Rollback Rule violated the APA's requirement that agencies provide the public with "adequate notice and opportunity for comment" before promulgating a new rule. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110-11 (D.C. Cir. 2014); *see also* 5 U.S.C. § 553(b)-(c). Although a final rule need not mirror a proposed rule in every particular, it must be a "logical outgrowth" of the proposal, such that interested parties could have "anticipated the change" and thus commented on it at that stage. *Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 86 (D.D.C. 2012) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005)), *aff'd in part & rev. in part on other grounds*, 746 F.3d 1102.

That did not happen here. While OSHA concluded in its Rollback Rule that it would need to use a two-tiered manual review process to ensure worker privacy at a cost of $7.5 million per year, 84 Fed. Reg. at 402, OSHA's proposed rule estimated only that the costs of reviewing the

15

data from Forms 300 and 301 would range from $53,000 to $64,000, 83 Fed. Reg. at 36,503. In other words, the Rollback Rule's new $7.5 million estimate was a greater than 100-fold increase over the proposed rule's projection—hardly a logical outgrowth. That is particularly troubling here, because the change is not just the result of new math by the agency, but the result of the agency's decision to introduce an entirely new procedure when it issued its final rule—the two-tier manual review process mentioned above. 84 Fed. Reg. at 402. The public, including the parties to this suit, never had the requisite opportunity to comment on the need (or lack thereof) for this manual review process or on the staggering increase over the Electronic Reporting Rule's cost estimate. To the contrary, while OSHA's proposal alluded generally to concerns about de-identification software, the agency did not identify any alternative method of review, nor did it estimate the costs of any such alternative method. *See* 83 Fed. Reg. at 36,498, 36501-03. Thus, the public could not have anticipated OSHA's decision to adopt this two-tiered manual review process and could not have reasonably expected to comment on it before publication of the final rule.

Defendants' responses fall short. First, Defendants contend that the State Plaintiffs "do not … take issue with OSHA's *calculation* of the costs." Def. Br. 28 (emphasis in original). That response misses the point. The Plaintiff States allege that OSHA violated the APA's procedural requirements by failing to give notice of its greater than 100-fold increase in projected costs. While Plaintiff States do not concede the accuracy of OSHA's estimate, they are principally concerned with OSHA's failure to abide by the APA's *procedural* commands, and not with the substantive validity of OSHA's cost estimate. Simply put, Defendants are defending the "ends," while Plaintiff States' challenge is about the "means" of getting there. Defendants' response is a non-sequitur— and a revealing effort to shift the focus away from the Rollback Rule's procedural invalidity.

16

Defendants also cite a series of broad, open-ended questions OSHA posed in the proposed Rollback Rule. *See* Br. 29. The first such series of questions asks the public to comment on the risks to worker privacy, how OSHA could "make them [*i.e.*, the privacy risks] less likely," and the "resources [that] would be required" to mitigate the privacy risks. 83 Fed. Reg. at 36,500; Br. 29. The second series of questions asks the public about the use of de-identification software by other agencies and organizations and about the challenges those agencies and organizations faced. 83 Fed. Reg. at 36,500; Br. 29. Such general questions do not suffice to apprise the public that a two-tiered manual review would be necessary to ensure worker privacy. Nor are they enough to warn of a possible *100-fold* increase in projected costs. Indeed, nowhere did the questions so much as mention the need for two-tiered manual review or the staggering costs OSHA claims such review would entail. As the D.C. Circuit has put the point, such a "general notice that [an agency] might make unspecified changes … is too general to be adequate." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). To the contrary, under the APA, an "[a]gency notice must describe the range of alternatives being considered with *reasonable specificity*." *Id.* (emphasis added). Nothing in Defendants' Brief demonstrates that these vaguely worded questions satisfied OSHA's burden under the APA.

Ultimately, neither of Defendants' responses overcome the fatal procedural flaw Plaintiff States described, or offer any reason to think that the public here could have "divine[d] [OSHA's] unspoken thoughts" and commented on them. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009). Changes far less dramatic have failed the "logical outgrowth" test. *See, e.g.*, *id.* (holding that a final rule was not a "logical outgrowth" where it revised the number of years from which data could be collected for purposes of resolving certain rail rate disputes

17

from one to four). Where an agency wishes to introduce a brand new review process at a 100-fold cost increase, it must give the public fair notice and a chance to comment. OSHA did not do so.

**CONCLUSION**

For the reasons set forth above, this Court should grant the Plaintiff States' motion for summary judgment and deny the Defendant's cross-motion for summary judgment. The Rollback Rule should be permanently enjoined and declared unlawful under the APA.

Respectfully submitted,


DATED:  August 16, 2019                      GURBIR S. GREWAL
                                             Attorney General of New Jersey

                                             s/_Glenn J. Moramarco_____
                                             GLENN J. MORAMARCO
                                             Assistant Attorneys General
                                             (admitted 2/27/2019)
                                             ERIC L. APAR
                                             (admitted 2/26/2019)
                                             ELSPETH FAIMAN HANS
                                             (admitted 1/24/2019)
                                             Deputy Attorneys General
                                             New Jersey Attorney General's Office
                                             Richard J. Hughes Justice Complex
                                             25 Market Street
                                             Trenton, NJ 08625
                                             (609) 376-3235
                                             Glenn.Moramarco@law.njoag.gov
                                             *Attorneys for Plaintiff State of New Jersey*


KWAME RAOUL                                  BRIAN E. FROSH
Attorney General of Illinois                 Attorney General of Maryland

s/ *Harpreet Khera*_____           s/ *Leah J. Tulin*_____
HARPREET KHERA                               Leah J. Tulin
Deputy Bureau Chief                          Jeffrey P. Dunlap
ELIZABETH ROBERSON-YOUNG                     Assistant Attorneys General
Public Interest Counsel                      Office of the Attorney General
AARON WENZLOFF                               200 Saint Paul Place, 20th Floor
Assistant Attorney General                   Baltimore, Maryland 21202
100 West Randolph Street, 12th Floor         (410) 576-7906

18

Chicago, IL 60601
(312) 814-3000
AWenzloff@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

ltulin@oag.state.md.us
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

MAURA HEALY
Attorney General of Massachusetts

s/ *Amy L. Goyer*
AMY L. GOYER
Assistant Attorney General
Massachusetts Attorney General's Office
105 William Street
New Bedford, MA 02740
(617) 963-2319
Amy.Goyer@mass.gov
*Attorneys for Plaintiff Commonwealth of*
*Massachusetts*

KEITH ELLISON
Attorney General of Minnesota

s/ *Christie B. Eller*
CHRISTIE B. ELLER
Deputy Attorney General of Minnesota
JONATHAN D. MOLER
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
St. Paul, MN 55101-2127
(651) 757-1330
jonathan.moler@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

LETITIA JAMES
Attorney General of New York

s/ *Matthew Colangelo*
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
D.C. Bar No. 997893
RENIKA MOORE
Bureau Chief, Labor
JULIE ULMET
Assistant Attorneys General
28 Liberty St., 19th Floor
New York, NY 10005
(212) 416-6305
Matthew.Colangelo@ag.ny.gov
*Attorneys for Plaintiff the State of New York*

19